# EXHIBIT 1

# 30(b)(6) Suzanne Jessee

# David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

# October 10, 2025



1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
6 South Second Street, Suite 718  Yakima, Washington  98901
Bellingham  |  Everett  |  Tacoma  |  Olympia  |  Yakima  |  Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
www.buellrealtime.com
email: transcripts@buellrealtime.com



Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

_____

DAVID PENNER MD, PLLC, a Washington    )
professional limited liability              )
company, d/b/aOLYMPIA CENTER FOR TMS &    )
PSYCHIATRY; DAVID PENNER, an             )
individual,                             )
                                        )  Case No:
        Plaintiff,                      )  3:25-cv-05033
                                        )
    vs.                                 )
                                        )
CLEAR TMS+, PLLC, a Washington          )
professional limited liability          )
company; DianaWilcox, an individual,    )
                                        )
        Defendants.                     )

_____

VIDEOCONFERENCE 30(B)(6) DEPOSITION UPON ORAL
EXAMINATION
OF
SUZANNE JESSEE

_____

(All participants appearing via videoconference.)

Taken at
Rancho Mirage, California

DATE TAKEN:  October 10, 2025

REPORTED BY:  KATHLEEN HAMILTON, RPR, CRR, CCR 1917
            California CSR 11595

Page 2

1        A P P E A R A N C E S
2
    APPEARING VIA VIDEOCONFERENCE FOR THE PLAINTIFF:
3
        ARTHUR A. SIMPSON
4       Rocke Law Group, PLLC
        500 Union Street
5       Suite 909
        Seattle, Washington 98101
6       206.652.8670
        arthurs@rockelaw.com
7
8
    ALSO PRESENT VIA VIDEOCONFERENCE:
9
        DAVID PENNER
10
11              * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           DEPOSITION OF SUZANNE JESSEE
2               EXAMINATION INDEX
3  EXAMINATION BY                         PAGE
4  MR. SIMPSON.............................  4
5
6
7               EXHIBIT INDEX
8  EXHIBITS FOR IDENTIFICATION              PAGE
9   1  NOTICE OF DEPOSITION OF TMS THERAPY NEAR ME    22
   2A  Exhibit 2             29
10  2B  DECLARATION OF ALICIA CARTER IN SUPPORT OF    29
       PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
11  2C  Exhibit 1             29
3   Email from Diana Wilcox to TMS Therapy Support    43
12      sent 1/31/2025, 4 pages
4   TMSTherapyNearMe David Penner MD PLLC listing, 4    62
13      pages
5   Email from David Penner to Aaron Rocke, et al.,    62
14      sent 10/10/2025, 2 pages
15
16
17      ** All quoted material appears as read. **
18
19
20
21
22
23
24
25

Page 4

1        RANCHO MIRAGE, CALIFORNIA; OCTOBER 10, 2025
2            9:04 am
3            -o0o-
4
5        THE REPORTER:  We are on the record.
6        Counsel, can I get a stipulation on the
7  record that, because I am a Washington State Certified
8  Court Reporter and the witness is located in Rancho
9  Mirage, California, that I can swear in the witness
10 remotely.
11       MR. SIMPSON:  So stipulated.  Thank you.
12
13 SUZANNE JESSEE, witness herein, located in Rancho
14 Mirage, California, having been first duly sworn on oath
15 by the Washington Certified Court Reporter on
16 stipulation of counsel, was examined and testified as
17 follows:
18
19           E X A M I N A T I O N
20 BY MR. SIMPSON:
21       Q.  Good morning, Ms. Jessee.  Would you please
22 state your full name, and spell your last name for the
23 record.
24       A.  It's Suzanne Jessee.  S-u-z-a-n-n-e,
25 J-e-s-s-e-e.

Page 5

1     Q. All right.

2        Have you ever had your deposition taken before,

3  Ms. Jessee?

4     A. I have.

5     Q. Okay. I'm gonna go through a few ground rules

6  just in case it's been a while and just to help set some

7  protocols today for everybody's convenience.

8        So I'm going to be, obviously, asking you

9  questions on the record, and you're gonna be answering

10  on the record. And because there's a verbatim

11  transcript being prepared by the court reporter, we all

12  need to do our best job to make sure that we give each

13  other a chance to finish speaking, because the court

14  reporter can't capture accurately verbatim testimony if

15  we're both talking at the same time.

16        And so just try to wait a beat or two after I

17  finish asking the question before you start, just to

18  make sure that we have some extra breaks in our cadence,

19  even though it's not the natural flow of conversation.

20        Understood?

21     A. Completely.

22     Q. Okay. And I'm going to -- this is not gonna be

23  a long deposition. But nevertheless, I'm going to

24  endeavor to make sure we take a break at the top of

25  every hour so that the court reporter and everybody else

Page 6

1  has a chance to take a -- take a break and do what they

2  need to do this morning, grab coffee, et cetera.

3        So if you need another break during the

4  deposition at any time, please feel free to let me know.

5  I'm happy to accommodate you. The only request that I

6  have is that, if there's a question pending, you answer

7  the question before we go off the record and take a

8  break; okay?

9     A. Sure.

10     Q. And I'm gonna be sharing some exhibits through

11  the chat function today.

12        Are you on a PC or a laptop that will facilitate

13  your ability to download some PDFs so you can review

14  these documents along with me?

15     A. I am.

16     Q. Excellent.

17        And I know in day-to-day business, we're all

18  used to multitasking on our computers, but I would ask

19  that, during this deposition, you not have anything open

20  besides the Zoom client that we're using for this

21  deposition just to avoid your having to read any

22  documents inadvertently during the course of the

23  deposition; okay?

24     A. It sounds good.

25     Q. Okay. Just for the sake of the record, where

Page 7

1  are you testifying from today?

2     A. Rancho Mirage, California.

3     Q. And are you in your residence?

4     A. Yes.

5     Q. Is there anybody else in the room there with

6  you?

7     A. No. But my husband is here. He does come in

8  and out periodically.

9     Q. And that's fine.

10        All right. And earlier you said you have been

11  deposed before; correct?

12     A. I have.

13     Q. Okay. How many times have you been deposed

14  before?

15     A. I think just one.

16     Q. Can be an occupational hazard in some

17  professions.

18        And do you remember the type of case in which

19  you were deposed?

20     A. I do.

21     Q. What type of case was that?

22     A. At the time, I was a therapist at the Betty Ford

23  Center, and there had been a suicide from an active

24  patient.

25     Q. Oh, that's unfortunate.

Page 8

1        Do you remember how long ago your deposition

2  was?

3     A. It was probably 12 years, close to 12 years.

4     Q. And do you recall whether you were a party in

5  that lawsuit or just a witness?

6     A. Hmm. He was my client, so I'm not sure.

7     Q. All right. May have been a party, just not

8  sure?

9     A. Right.

10     Q. Do you recall how that came resolved --

11     A. I don't.

12     Q. -- at all?

13     A. Huh-uh.

14     Q. Did you have to testify in a trial in that case,

15  or was it just your deposition, to your best

16  recollection?

17     A. It was just my deposition. To my knowledge, it

18  did not go to trial.

19     Q. Okay. We're gonna switch gears here a little

20  bit and just get a brief sense of your professional

21  educational background. You hinted just a moment ago

22  you were at least at one point in time working as a

23  therapist at the Betty Ford clinic. Let's take it from

24  the top.

25        I assume you've got post-high school education?

Page 9

1    A.  I do.  I have a master's degree.
2    Q.  What's your master's degree in?
3    A.  Addiction studies with a licensed professional
4  counselor track.
5    Q.  Do you remember when you received your master's
6  degree?
7    A.  2011.
8    Q.  And from which institution?
9    A.  Hazleton Betty Ford Graduate School of Addiction
10 Studies.
11   Q.  Prior to obtaining a master's degree, did you
12 obtain a bachelor's degree?
13   A.  I did.
14   Q.  What was your bachelor's degree in?
15   A.  It was bachelor's in psychology and
16 communications.
17   Q.  Do you remember when you received that degree,
18 your bachelor's degree?
19   A.  That was in 2009.
20   Q.  Okay.  And which institution of learning was
21 that from?
22   A.  Eastern Michigan University.
23   Q.  Any other degrees from an institution of higher
24 learning in addition to the bachelor's and master's
25 degree we've just discussed?

Page 10

1    A.  No.
2    Q.  Any other professional certifications?
3    A.  No.
4    Q.  Okay.  And sometimes lawyers ask questions that
5  seem very self-evident.  I need you to bear with me,
6  because some of these times -- there's no record of it,
7  but you presumably know that I know the answer to some
8  of the questions, such as:  Are you presently employed?
9    A.  No.
10   Q.  Are you presently a business owner?
11   A.  Yes.
12   Q.  Okay.  And what's the name of your business?
13   A.  It's TMSTherapyNearMe.com.
14   Q.  And what's your role specifically with
15 TMSTherapyNearMe.com?
16   A.  I'm the founder and the acting CEO, but I don't
17 draw an income.  I'm officially retired, technically
18 retired.
19   Q.  And when you say when you're actually -- we'll
20 come back to TMSTherapyNearMe.com in a moment.  We'll
21 talk about what -- what are you retired from?
22   A.  So I founded Anew Era TMS.
23   Q.  When did you found new era TMS [sic]?
24   A.  In 2018.
25   Q.  And when did you retire from new era TMS?

Page 11

1    A.  July of 2022 when we sold to Discovery
2  Behavioral Health.  We were an MSO.
3    Q.  And what's your understanding of what an MSO is?
4    A.  Managing services organization.
5    Q.  Describe briefly, in lay terms, to the best of
6  your ability, what managing services organization is.
7    A.  It's a contractual agreement with a physician
8  to -- it allows for laypeople to own and operate medical
9  services under contract with a licensed medical
10 provider.
11   Q.  And was it an MSO during the entirety of its
12 existence until it was sold to Discovery Behavioral
13 Health?
14      THE REPORTER:  Sorry, was there an answer?
15      THE WITNESS:  Yes.
16 BY MR. SIMPSON:
17   Q.  One of the things I forgot to mention during my
18 preliminary spiel on depositions is that, in normal
19 conversation, we're used to nonverbal answers to
20 questions.  And we need to do our best to make sure that
21 we respond verbally instead of with, you know, shrugs,
22 nods, et cetera, so the court reporter can capture what
23 we're doing.  You may catch me doing it too.  We just
24 need to make sure we do our best to be mindful of it.
25   A.  Yes.

Page 12

1    Q.  What, to your understanding, is TMS therapy?
2    A.  TMS is transcranial magnetic stimulation.  It's
3  a treatment device and a treatment protocol for
4  depression, anxiety, OCD, off label a few other
5  conditions.
6    Q.  Like what?
7    A.  Could be for PTSD, Parkinson's, stroke rehab, a
8  number of different medical conditions.
9    Q.  Does it have any applications on or off label
10 for addiction therapy, addiction treatment?
11   A.  Not that are FDA cleared, to my knowledge, at
12 this point.  I know that there's some ongoing studies
13 for that, but...
14   Q.  Okay.  So earlier in your career, it sounds like
15 you were focused, including in your educational
16 background, in addiction treatment; correct?
17   A.  Correct.
18   Q.  Okay.  So how did you make the transition from
19 addiction special -- addiction specialty in practice to
20 transcranial mag-- magnetic stimulation?
21   A.  That's correct.
22   Q.  Okay.
23   A.  So yes, I had spent roughly 20 years in
24 different capacities in the chemical dependency field.
25 Chemical dependency is often a cooccurring with mental

Page 13

1   health issues, so I was exposed to both conditions and
2   the treatment of both conditions, many different levels.
3        And eventually I transitioned from patient care
4   to marketing and business development with a large group
5   of psychiatrists, Achieve.  And they were providing TMS,
6   which is how I learned about the treatment.  And in that
7   capacity, I educated other physicians that were unaware
8   of the treatment for -- under the employment of Achieve.
9        Q.  What was your title when you were working in
10  marketing/business development for Achieve?
11       A.  Business strategist.
12       Q.  How long did you work as a business strategist
13  for Achieve?
14       A.  Just about a year.  And then I left to begin
15  opening my own clinics.
16       Q.  Okay.  Was that one year, when you were the
17  business strategist at Achieve, the first time in your
18  professional career your work turned towards marketing
19  and business development?
20       A.  No.
21       Q.  Okay.
22        Tell me about your earliest work doing marketing
23  and business development.
24       A.  Oh, gosh.  I mean, very young, I worked for
25  Autotrader and provided marketing services.  But I also

Page 14

1   was just always a dabbling entrepreneur and was
2   self-taught.  I worked in communications industry and
3   business development, marketing for that organization.
4        Q.  So you say it's basically been part of your
5   career in --
6        A.  It has been.
7        Q.  -- various roles throughout?
8         Do you have any background in software
9   engineering or setting up websites?
10       A.  Not in the development of websites, but I've
11  certainly worked hand in hand with many developers to
12  develop websites for companies that -- that I was a part
13  of or owned.
14       Q.  Turning back to your role -- your role as an
15  owner and acting CEO of TMSTherapyNearMe.  I want to get
16  some background on the company.
17        First of all, where, if anywhere, is
18  TMSTherapyNearMe incorporated, which state?
19       A.  It is incorporated in Delaware.
20       Q.  And are you the sole owner of the company?
21       A.  No.
22       Q.  Who else owns the company?
23       A.  My daughter.
24       Q.  Anybody else besides you and your daughter?
25       A.  No.

Page 15

1        Q.  Does the company have any physical offices
2   anywhere?
3        A.  No.
4        Q.  Does it have any employees?
5        A.  Just contractors.
6        Q.  How many contractors?
7        A.  I have two -- two contractors that -- that work
8   in-house, and then two different vendor groups that I
9   work with.
10       Q.  What do you mean by "vendor groups"?
11       A.  The website development.  So I guess -- I guess
12  I actually have -- if you include, you know, my -- the
13  plug-ins for the website, I work with multiple
14  organizations, but really just the people that I work
15  with that help me do marketing and build the site and,
16  you know, functionality, marketing of the site, is
17  really just one organization.  And that's Pilot
18  Practice.
19       Q.  And that -- that's a vendor of yours, Pilot
20  Practice?
21       A.  Yes, correct.  I don't work specifically for any
22  practice, just -- we just provide directory services.
23       Q.  Yeah, let's use this as an opportunity for you
24  to expound upon that.
25        What does your company do?

Page 16

1        A.  So it's a -- it's a directory, an online
2   directory for TMS, and now we're also providing
3   directory opportunities for clinics that offer ketamine
4   and SPRAVATO.  So it's very focused on those three
5   medical services, psychiatric services.
6        Q.  Okay.  And how does the directory work?  People
7   contact you to be included on it?  Do you reach out to
8   people in the TMS field?
9        A.  So primarily, yes, the clinics would, you know,
10  become aware of us somehow, either by our marketing
11  efforts or just finding it in their normal search to see
12  what's going on in the industry.  And they would reach
13  out to us and, you know, inquire about having a verified
14  profile on our site.
15        So that's one way we interact with the public.
16  The other way is patients that are seeking treatment
17  might search "TMS near me" and they would obviously,
18  from that search term, find our website and realize that
19  they can search for clinics that are near them that
20  provide TMS services.
21        So we provide -- they can reach, actually, those
22  clinics in a couple of different ways.  We have general
23  form fills on the website, so if a patient is -- or
24  potential patient is looking around on the website
25  wanting to inquire about TMS services, they can fill out

Page 17

1  a general form fill, which would not be on a particular
2  clinic's profile listing. And in that general form
3  fill, it would come in-house to one of my contract
4  employees, and we would then refer them to three clinics
5  listed in the general area of where they are within a
6  20-mile radius, for example.
7      From an ethical perspective, we, you know, learn
8  throughout that, you know, mental health services, when
9  you make a referral, ethically you should make three --
10 at least three referrals. You don't want to, as a
11 provider, provide just one referral.
12     Q. And why is that, to your understanding?
13     A. It's just ethically important to provide three
14 so that they have a choice, so that we're not -- you
15 know, we want to avoid looking like that we are driving
16 traffic to one particular institution or organization.
17     Now, on the other hand, if you have a verified
18 profile, the form fill on that profile, if -- if a
19 potential patient goes to that profile of a particular
20 clinic and they fill out a form fill, then it goes
21 directly to that clinic and it is not what we refer to
22 as a shared lead. But you have to have a verified,
23 active, paid subscription to be able to have exclusive
24 patient leads.
25     Q. Okay. That's the second way. Okay. What's the

Page 18

1  third way? You mentioned three?
2      A. It's actually just those two.
3      Q. Okay. So what happens if somebody goes to
4  the -- there are unverified profiles in the website;
5  right?
6      A. Correct.
7      Q. Okay. What if an Internet user goes to an
8  unverified profile?
9      A. In that case, if there's a -- if there's a form
10 fill -- and I actually would have to look on the site to
11 verify. I don't even think we have form fills on
12 unverified profiles. They would -- but if there was a
13 form fill there, it would go directly in-house. It
14 would not go directly to that clinic.
15     As a directory profile company or a directory
16 company, online directory, it's important for Google
17 ranking to try to list everyone in that space so that
18 you can rank, you know, in that particular geographical
19 area.
20     However, you know, there's a lot of benefits
21 that a paid subscription offers rather than, you know,
22 the -- the nonverified listings. They don't really have
23 any advantage to themselves. It's more of an advantage
24 to us. But it does provide us some data for our
25 in-house people to see who's in that area. It gives

Page 19

1  a -- a mile radius of where they are as it relates to
2  that patient.
3      You know, geography is very important to a
4  patient that's considering this particular treatment,
5  because it's so time intensive.
6      Q. Right.
7      Step back and follow up on one thing you just
8  said.
9      A. Okay.
10     Q. In the unverified -- if there's a form fill,
11 you're not sure, and it goes directly in-house, for an
12 unverified user, what would that information going to
13 in-house include, and what would your in-house folks do
14 with it?
15     A. Well, it'd be the same as I described earlier.
16 If a potential patient fills out a form on an unverified
17 listing, it would go in-house. And then our contract
18 employees would then refer that patient to three clinics
19 in that area. And it may include that verified listing,
20 but it would definitely include two others.
21     Q. You said it may include the listings. That
22 doesn't sound like it always will include that listing.
23     A. Correct. It depends on the geography. They may
24 have picked a close one. They might not have. We would
25 verify again their location and provide the most

Page 20

1  convenient locations to their geography.
2      Q. Okay. So when your organization's picking the
3  three for ethics reasons, how does it pick the three?
4  Is it based solely on proximity geographically?
5      A. It is. Now, if -- for example, you know, when
6  we make those referrals, we may make those referrals to
7  a subscribed lister. And we would probably give them --
8  no, we would give them preferential consideration in
9  that referral, because they are a paid subscriber, even
10 though that client didn't go directly to their location,
11 meaning their profile. So...
12     Q. So what does that mean in practice?
13     A. It means that, let's say -- let me just give you
14 an example. If -- if a potential patient filled out a
15 form fill on a nonverified listing and they were in, you
16 know, ZIP Code 20057, then we would look at, you know,
17 where's the closest locations, and not -- we would not
18 give consideration to whether or not -- we would give
19 consideration. This is hard to explain.
20     Q. That's all right. (Laughing.)
21     A. We would -- we would refer that patient to the
22 most convenient locations, but we would give prefer- --
23 preferential consideration if we had a location in that
24 area that was a subscribed lister. So they make -- they
25 may be referred to a nonsubscribed listing, they might

Page 21

1   be referred to a featured listing, and they might be
2   referred to a standout listing.  It really depends on
3   the geography.
4        Q.   What's a -- what's the difference between a
5   featured listing and a standout listing?
6        A.   A standout listing just ranks higher on the
7   website, so you're gonna see that listing first.
8   There's some other benefits to a standout listing, but
9   that's primarily what it is.  It's more colorful; it's
10  more attractive.  Just has preferred placement and a few
11  other benefits.
12        Can you hold just a moment?
13       Q.   Sure.
14       A.   Okay.  Sorry.
15       Q.   And if it's all right with you, actually, I need
16  to refill my coffee, so if we could take our hourly
17  break here a little bit early and take 10?
18       A.   Sure.
19            MR. SIMPSON:  Let's go off the record,
20  please.
21            (A break was taken
22            from 9:32 AM to 9:42 AM.)
23  BY MR. SIMPSON:
24       Q.   All right, Ms. Jessee.  I'm gonna continue here,
25  but we're gonna change gears a little bit and talk about

Page 22

1   your preparation for this deposition today.
2        Can you tell me what, if anything, you did to
3   prepare to testify on behalf of TMSTherapyNearMe today?
4        A.   Yes, I reviewed all the files that I could find
5   related to our relationship with -- with the defendant.
6   I believe Diana Wilcox.
7        Q.   Okay.  Clear TMS+ and Diana Wilcox?
8        A.   Yes, correct.
9        So I looked on our payment portal.  We had a
10  number of different email transactions and, yeah, just
11  tried to look at everything that I had.
12       Q.   Okay.  I'm gonna circulate in the chat box
13  what's gonna be marked as the first exhibit.  It's gonna
14  be mark as Exhibit 1.
15            (Exhibit No. 1 marked.)
16  BY MR. SIMPSON:
17       Q.   So please feel free to download, open and review
18  this document to your satisfaction.
19       A.   Let's see here.  I do not -- can I just -- do I
20  have to save it to see it, I guess?
21       Q.   You just need to make a little folder on your
22  desktop, I find, and just save it to there.
23       A.   Yeah.
24            Well, hmm.  It's not the Notice of Deposition,
25  is it?  Or is it?

Page 23

1        Q.   It is.
2        A.   Okay.  Okay.  Got it.
3        Q.   Okay.  Are you familiar -- you've seen this
4   document.  Are familiar with it?
5        A.   Yes.
6        Q.   Okay.  Can I just draw your attention to the
7   third of this four-page -- third page of this four-page
8   PDF to Exhibit 1.
9        A.   Okay.
10       Q.   Okay.  And you recognize these topics here?
11       A.   Yes.
12       Q.   Okay.  And you reviewed these topics prior to
13  appearing here today?
14       A.   Yes.
15       Q.   Okay.  And as a formality, you have
16  TMSTherapyNearMe's authority to testify on behalf of the
17  company with respect to these topics?
18       A.   Yes.
19       Q.   Okay.  And sounds like you reviewed documents to
20  prepare to address these topics today as well; correct?
21       A.   Correct.
22       Q.   Okay.  So we see Topic 1.  We've already talked
23  a bit about TMSTherapyNearMe and services it provides.
24        Does it provide any additional services beyond
25  what we've discussed today with its directory services?

Page 24

1        A.   No, does not.
2        Q.   So solely a directory service?
3        A.   Solely a directory service.  Yeah, we -- we may
4   provide an article, or they actually -- the clinic may
5   provide an article that we might back-link to, but we
6   don't develop any marketing materials whatsoever for --
7   for the clinics themselves.
8        Now, I have recently begun developing some
9   marketing material for the TMS manufacturers, because
10  we're offering a promotion for the clinics that are
11  under -- or that, you know, buy their systems.  But
12  outside of that -- and that just began just weeks ago.
13  So -- but before that, we did not provide any marketing
14  materials or development for individual clinics.
15       Q.   And you said that you might create, you say,
16  back-links to their marketing materials?
17       A.   Yes.
18       Q.   What does that mean?
19       A.   It just means like if they sent to me an
20  article, then we might link it to -- to our website just
21  to give it an SEO boost or, you know, if -- if they have
22  a stand -- a standout verified subscription listing.
23       Q.   Are there tiers of verification listing
24  subscriptions?
25       A.   There are tiers.

6 (Pages 21 to 24)

Page 25

1    Q.  What are they?
2    A.  Standout listing is the highest level.  And then
3  a featured listing is the intermediate level.  And then
4  what we used to call free listing is really just a
5  placeholder listing.  We don't -- we don't offer a free
6  listing.  It's just there as a placeholder.
7    Q.  Explain to me the -- or describe for me a
8  placeholder listing.
9    A.  It just refers back to what I explained earlier
10  that, when you have a directory, that you -- you need to
11  have the listings of every clinic you can possibly find
12  so that you're providing optimal ranking for your
13  subscribed users.  So we want to -- even if I don't have
14  a subscribed clinic in a particular geography, I want to
15  be able to rank there in that area so that, when I do
16  have a subscribed users, then they already have the SEO
17  that would benefit for their clinic.
18    Q.  You said SEO?
19    A.  Search engine optimization.
20    Q.  So this -- your registry and website endeavored
21  to have a placeholder listing or a subscribed listing, I
22  guess, ideally, for every TMS therapy clinic in the
23  country?
24    A.  We endeavor to do that, yes, a subscribed
25  listing.

Page 26

1    Q.  And are there placeholder listings for the rest?
2    A.  I'm not sure that we -- we have all of them.
3  You know, we try to do our best to get every one we can,
4  but I would say we have the majority for sure.
5    Q.  Do they have to have a web presence for you --
6  your organization to find them?
7    A.  Yes.
8    Q.  And do you inform TMS clinics that they're being
9  posted or listed on your registry?
10    A.  For the placeholder listings?
11    Q.  Yeah.
12    A.  Yes, we have a -- you know, where we can, we
13  have a -- what we would call a drip campaign and just
14  letting them know.  Also -- so in the event, for
15  example, that we make a referral to a placeholder
16  listing, because the geography is -- is ideal for a
17  patient, then we would notify them that we've sent them
18  a shared -- a shared lead, and we would ask them to set
19  up a call for us to learn more about how to get direct
20  patient leads.  So we use that as a marketing
21  opportunity as well when we send a lead to a
22  nonsubscribed listing.
23    Q.  But the nonsubscribed listings, when you're
24  sending them a lead, how do you get their contact
25  information to get those marketing materials to them?

Page 27

1    A.  Just from the web.  Most clinics provide some
2  sort of email to contact on their website, a general
3  usually.
4    Q.  Okay.  Probably turn back to the exhibit.  I
5  want to look at Number 2 with you.  The topic is, "R&J
6  Technologies, dba Pilot Practice."
7    That's the vendor we were talking about earlier?
8    A.  Correct.
9    Q.  Okay.  And that's your primary vendor, as I
10  understood your testimony earlier; is that right?
11    A.  That's correct.
12    Q.  Okay.  And has that always been the case since
13  you founded the company?
14    A.  No.  Prior to we used a company called Cesson.
15  It's C-e-s-s-o-n.
16    Q.  When did you stop using Cesson as a vendor?
17    A.  Gosh, it's been a little over a year.
18    Q.  So like September-ish 2024?
19    A.  I would say July, August last year.
20    Q.  I know you gave a brief kind of overview and
21  summary of what Pilot Practice does for you.  I just
22  want to make sure that I understood it.
23    Can you kind of -- taking it from the top,
24  what -- since it became your primary vendor, what all
25  does Pilot Practice do for your company?

Page 28

1    A.  They -- they build the website.  They -- well,
2  they do a lot of things (laughing).  So they do
3  everything related to the website and search engine
4  optimization, you know, the optimization and
5  functionality of every element of the website.
6    This is a very complicated website, as you can
7  imagine.  We have thousands and thousands of pages on
8  this website.  And it takes a lot of what we call
9  plug-in software to accomplish everything that we need
10  to accomplish in an efficient manner.  And they -- they
11  provide those services and just ongoing daily needs to
12  manage the website.
13    Q.  So they serve as your help desk if there's a
14  crash or something, kind of all that stuff on a
15  day-to-day basis?
16    A.  Yes.  And they would also provide ad services if
17  we wanted to pay for ads on any social media platform.
18  They would develop the content, develop the ads, buy the
19  ad placement on our behalf, that kind of thing.
20    Q.  Okay.  A full-service shop?
21    A.  Yep.
22    Q.  So we're gonna put the notice here, this
23  Exhibit 1, away for now.  We'll be referring back to it
24  throughout the morning.  But for now I want to circulate
25  what are gonna be marked as Exhibits 2A, 2B, and 2C.

7 (Pages 25 to 28)

Page 29

1           **(Exhibit Nos. 2A-2C marked.)**
2    BY MR. SIMPSON:
3        **Q.  Please feel free to download those three**
4    **exhibits.**
5        A.  2A?
6        **Q.  Yeah, you should have 2A, 2B and 2C.  We'll talk**
7    **about 2A -- well, we'll talk about them in sequence.**
8        A.  Okay.
9        **Q.  Oh, sorry, out of sequence.  I mislabeled them.**
10   **We'll start with 2B, actually.  My apologies.**
11       A.  We're gonna start with 2B?
12       **Q.  2B, yeah.**
13       A.  Let me just save all of them.  Give me just a
14   moment.
15       **Q.  Sure, take your time.  Just let me know when**
16   **you're done.**
17       A.  Okay.
18           Okay.  You want to look at 2B first?
19       **Q.  Yes, please.**
20       A.  Okay.
21       **Q.  All right.  First of all, have you seen the**
22   **document that's been marked as Exhibit 2B before?**
23       A.  I do not recall reading this.
24       **Q.  Okay.  Well, will you please take a moment --**
25       A.  I may have gotten it, yeah.

Page 30

1        **Q.  You may have gotten it, or you're not sure?**
2        A.  I'm not sure, yeah.
3        **Q.  Why don't you take a moment to read it before we**
4    **talk about its contents.**
5        A.  Okay.
6        **Q.  Just let me know when you're done.**
7        A.  (Reviews exhibit.)
8            Okay.
9        **Q.  Okay.  Are you familiar with the user experience**
10   **described in this declaration from Ms. Alicia Carter?**
11       A.  I am.  Yeah, this does not seem like the -- our
12   typical protocol from what she's describing here.  So
13   let me -- let me read if she's -- it seems like she
14   might be contradicting herself.
15           (Reviews exhibit.)
16           "When I was routed..."
17       I'm sorry, just a moment.
18       **Q.  No, take your time.**
19       A.  Okay.  Okay.  Let's see.  Okay.  Yes.  So in
20   this instance, if -- if Ms. Carter had gone specifically
21   to Dr. Penner's profile and filled that out, then we --
22   we wouldn't have even seen it.  Our back end doesn't
23   even see it when that happens.
24           Now, we can find it, but we can't -- it doesn't
25   come to us; okay?  So one of two things happened here.

Page 31

1    Either she did not originally send that form fill
2    directly to Dr. Penner's through his portal, or she --
3    she did another action as well.  She filled out two form
4    fills.
5            And I cannot find that information without
6    assistance, so I would have to find that and get back to
7    you, and I can demonstrate what exactly the course of
8    action was that she took.  So we can provide that.
9            But -- so let me -- let me reiterate, if she had
10   just filled out the form fill in Dr. Penner's profile,
11   it would not have come to our team.  It actually
12   bypasses our team.  There's no reason for us to have an
13   interaction with that potential patient lead when they
14   go directly to a profile site.  We don't work that lead,
15   so to speak.  So we don't capture it.  We don't give
16   another referral.
17           So we would -- it just isn't there is what I'm
18   telling you.  And she's saying that with an -- within an
19   hour, Clear TMS+ reached out to her.  That indicates to
20   me that she had to have either not gone directly to
21   Dr. Penner's site or she did both; she filled out a
22   general form fill, and she filled out one for his site.
23           If she filled out a general form fill, you know,
24   on our site somewhere, we would not have any knowledge
25   that she also went to Dr. Penner's profile.  So we are

Page 32

1    very dedicated to our subscribers and we don't, for lack
2    of a better word, poach their leads.  So they don't even
3    come to us.  So it takes -- our contract employees right
4    now don't even know how to search that data.  I'd have
5    to call in Pilot Practice, you know, our back end team,
6    and they don't even have access to this team.  Only I do
7    and Breanna, my daughter.
8            So, yeah, this -- something else is happening
9    here that she either didn't recall or just didn't
10   realize what she was doing on the site.
11       **Q.  Is it your understanding or do you have an**
12   **understanding as to whether or not Dr. Penner had a**
13   **verified posting on TMSTherapyNearMe?**
14       A.  I believe he did, but I can check that real
15   quick.
16           Would you like for me to?
17       **Q.  If you -- yeah, feel free.  I mean, it will --**
18   **if it will be helpful for you.**
19       A.  Is it helpful for you?
20       **Q.  Well, I mean, your -- you were just testifying**
21   **that Dr. Penner -- if she clicked on his posting with**
22   **your website, that the form she filled out would go**
23   **right to Dr. Penner, it wouldn't go to your team; right?**
24       A.  Correct.
25       **Q.  That's only if it's verified; right?  Because**

Page 33

1    you said unverified profiles earlier do go to your
2    contract employees; right?
3        A.  Yes.
4        Q.  So whether or not this referral would have gone
5    to your team or directly to Dr. Penner with no
6    visibility to your team would depend on whether or not
7    he had a verified profile; correct?
8        A.  Yes.  Yeah, that's true too.  Yeah.
9        Q.  Okay.  So why don't --
10       A.  So Dr. Penner's -- tell me again Dr. Penner's --
11   the name of his clinic?
12       Q.  Olympia TMS here.
13       A.  Okay.  And -- okay.  Give me just a moment.
14       Q.  David Penner, MD, PLLC.
15       A.  And the date we're talking about again is...
16       Q.  She said January 15th, 2025.
17       A.  Just a moment.
18           So -- let's see.  The email sometime is under,
19   like, whoever set the -- the account up for Dr. Penner,
20   so is there a -- like a -- an assistant, an office
21   manager that might have signed him up for this?
22       Q.  I mean, if you could -- you could go to the
23   website postings right now and see whether or not
24   they're verified; correct?
25       A.  Well, yeah, but that won't tell me if it was

Page 34

1    verified during that timeframe.
2        Q.  Do you have any -- do you have any reason to
3    believe today that it was verified?
4        A.  I would -- I just wouldn't know, you know.  I'm
5    not -- I'm not intimately familiar with all of the
6    subscribers on our site.
7        Q.  Okay.  Would it be helpful if we went offline
8    and took a 10-minute break so you could take a look?  I
9    don't want you to feel like you --
10       A.  Yeah, but I need -- I need that information.  If
11   there -- if there is another person, you know, that set
12   up this account for Dr. Penner that -- that -- you know,
13   the email that's associated to his payment link is what
14   I'm looking for.  That would help me find his
15   subscription.
16       Q.  You're assuming there's a subscription.
17       A.  I'm assuming there is.  I'm not finding one
18   right now, but I may not have the right information.
19       Q.  Yeah.  Well, I have no reason to believe that he
20   ever had a verified posting there.
21       A.  Oh, okay.
22       Q.  Yeah.
23       A.  Well, hang on just a second.  Let me just... let
24   me see.  Let's see here.
25           Okay.  Yeah, he does not have a verified

Page 35

1    listing --
2        Q.  Okay.
3        A.  -- as far as I can see.
4        Q.  Okay.  So assuming that that was the case on
5    January 15th, 2025, that it would have gone to your
6    staff then; right?
7        A.  Would have.
8        Q.  Okay.  And so if that's the case, what you were
9    explaining earlier about how this wouldn't have ended up
10   in front of -- that wouldn't have been accurate; right?
11       A.  I'm sorry, you didn't finish your sentence,
12   so...
13       Q.  That wouldn't have been -- that wouldn't have
14   been accurate, what you were explaining to me earlier
15   about how this must have been a mistake on her end
16   and --
17       A.  Yeah.
18       Q.  Did you want to -- do you want to revise what
19   you were saying before, this time assuming that there
20   was no verified listing as appears to be the case,
21   sitting here today, for Dr. Penner?
22       A.  Yeah, it -- the listing that she -- so she --
23   she just doesn't understand how it works.  So the -- the
24   placement holder listing; okay --
25           Can I share screen?

Page 36

1        Q.  Sure.
2        A.  Let's see.  So the placement holder listing --
3    oh, that's -- that's his site.  Just a second.  I'm
4    sorry.  Oh, gosh.  Give me just a minute.  I clicked off
5    of it.
6            Okay.  So Olympia Center, we actually have two
7    listings for him.  So these are placeholder listings.
8        Q.  Uh-huh.
9        A.  And when we were talking earlier, I wasn't sure
10   if the placeholder listings had form fills, but they do.
11       Q.  Uh-huh.
12       A.  But this is a general form fill.  This is not
13   going to go directly to Dr. Penner's clinic, because we
14   don't have that information.  And it's not a paid-for
15   listing.
16           Now, from the user's perspective, she believed
17   that this form fill was going directly to him, but
18   that's not what happens from... from our perspective;
19   okay.  That's not how we have it set up.
20           So when -- when a potential patient fills out a
21   form fill on a nonverified listing, we do refer them to
22   that listing, but we also refer them to two other
23   people, which is why Clear TMS+ got the lead as well.
24   So Carter --
25           Is that her name, Ms. Carter?

Page 37

1　　　Q.　Alicia Carter?
2　　　A.　Yeah, she wasn't wrong in assuming that that's
3　what she was doing; right?　But it -- it is not what
4　happens on nonverified listings.
5　　　Q.　What do you mean when you say that she wasn't
6　wrong in assuming that was happening?
7　　　A.　Well, because she clicked on the placeholder
8　listing for Olympia Center for TMS Psychiatry and filled
9　out a form here.　So she may have assumed that she
10　was -- and rightly so that she assumed that, that, you
11　know, she was filling out a -- an appointment booking
12　for just the Olympia Center for TMS & Psychiatry.
13　　　But if you do not have a preferred -- I mean, a
14　paid-for listing, you are not guaranteed exclusive
15　leads.　If Mr. -- if Dr. Penner had had a subscription
16　with us, then the form fill would have actually gone
17　directly to his clinic.
18　　　And one of the reasons why we -- we don't send
19　these directly when they are not verified listings is
20　because we do not have the information from their clinic
21　on who on their staff is managing our lead patient
22　referrals, which is a -- which is a critical piece of
23　information.
24　　　You know, these are -- these are informed
25　clients looking for treatment, and a lot of 'em are

Page 38

1　actively in a mental health crisis, and we want to make
2　sure that their -- their inquiry is going to be answered
3　in a timely manner.　So in order for you to have a -- an
4　exclusive lead that is not shared with another clinic, I
5　have to have the information, the contact information
6　and the name of the person that's managing these lead
7　referrals.
8　　　We're very particular about this.　We want to
9　make sure that our subscribed listers are doing their
10　due diligence in responding to these patients.　And I
11　can't -- I can't count on that if I haven't had a
12　conversation with them or our team hasn't had a
13　conversation with them to make sure that they're
14　well-staffed to be able to manage these patient leads.
15　　　Now, as I mentioned earlier, Clear TMS+ actually
16　had a listing during this time.　They had a subscribed
17　listing.　That was not why she got this lead also.　It
18　was more based on the geography.　But, again, you know,
19　we -- we want to make sure that they -- they get leads
20　too that are not from a direct lead, because, again, our
21　staff can't see those.　So there's no opportunity for
22　them, for lack of a better word, to -- or to, you know,
23　take advantage of patient leads to send to other
24　clinics.　Not an option.　We do not allow that for
25　subscribed users.

Page 39

1　　　Q.　For unverified users, you said that contact
2　information is gotten from whatever's on the web.
3　　　Is that ever updated, or is that just -- or does
4　the contact information basically remain static from
5　when the placeholder listing went up?
6　　　A.　So it is updated if -- if we send a lead to an
7　unverified listing and -- and the lead is either blocked
8　or we get an -- we get, you know, reply email saying
9　this is no longer here, or someone actually responds and
10　says we -- we don't offer TMS anymore, then we'll update
11　that listing.　Otherwise, it stays as it was when we
12　originally placed it.
13　　　Q.　Do you know whether or not TMSTherapyNearMe has
14　ever received a bounce-back from Olympia Center for TMS
15　& Psychiatry from a potential lead sent to it or
16　attempted to be sent to it by your company?
17　　　A.　A bounce-back?　You mean like we're not here?
18　　　Q.　Yeah, or your email can't be sent.
19　　　A.　I can check.
20　　　Q.　You don't know offhand?
21　　　I mean, you don't have to know everything.
22　　　A.　I don't know.
23　　　Q.　Okay.　Omniscience isn't expected, so just do
24　your best today.
25　　　Okay.　So Clear TMS+, at the time verified

Page 40

1　user -- I think we can take that down.　Thank you.
2　　　And so they would have gotten this lead along
3　with, I assume, two other clinics according to the usual
4　practices?
5　　　A.　According to usual practices, yes, unless --
6　unless there just wasn't another clinic that we felt
7　like was geographically relevant.　You know, there are
8　some remote areas that don't have, you know, multiple
9　clinics in a particular geography, but our practice is
10　three clinics.
11　　　Q.　And would it have included Dr. Penner's clinics,
12　like the one we were just looking at, do you know?
13　　　A.　It would have if it was geographically relevant.
14　　　Q.　And that would be sent to whatever contact
15　information was associated with his unverified profile?
16　　　A.　Correct.
17　　　Q.　When did the website first go up?
18　　　A.　Oh, gosh.　I think it was 2019.
19　　　Q.　And by what year, if you know, were the majority
20　of TMS therapy clinics in the U.S. included within the
21　registry?
22　　　A.　I'm not sure I understood your question.
23　　　Q.　Earlier you said that you think the majority of
24　TMS therapy clinics are up on your website through one
25　way or another, verified or unverified?

10　(Pages 37 to 40)

Page 41

1    A.  Uh-huh.  Uh-huh.
2    Q.  By what year did you achieve that feature of
3  having the majority of TMS therapy clinics in the U.S.
4  included on your registry?
5    A.  I think we've always had the majority.  We
6  continue to update that list periodically, not daily,
7  but probably every -- every six months we'll go through
8  a -- you know, just a search for new clinics.
9    Q.  Some of the unverified profiles could have old
10  contact information up from 2019, unless your team had a
11  reason to update it along the way; right?
12    A.  Correct.
13    Q.  Okay.  Turn your attention to Exhibit 2C.
14    A.  Okay.
15    Q.  Okay.  Looks familiar to what we were just
16  looking at.
17       Well, first of all, do you recognize what is
18  reflected here in Exhibit 2C?
19    A.  I do.
20    Q.  Okay.  And is this a screenshot of what we
21  were -- the posting from the web page we were looking at
22  similar to the one we were just looking at now, but for
23  David Penner, MD, PLLC?
24    A.  Yes, that was just under the listing that we
25  viewed earlier, but this is also an unverified listing.

Page 42

1    Q.  Okay.  And this declaration seems to be from,
2  you know, January 2025, so the website was set up the
3  same way back then?
4    A.  Yes.
5    Q.  And now to 2A, please, since I did everything
6  out of order.
7    A.  Just a moment.  Okay.  I'm just seeing the --
8  okay.  Okay.
9    Q.  Okay.  And, first of all, do you recall ever
10  having seen this email before?
11    A.  Just a moment.  "Thank you for your interest."
12       (Reviews exhibit.)
13       This did not come to me; no.
14    Q.  Sure.  And you don't recall anybody subsequent
15  to this event having shown you this email either?
16    A.  No.
17    Q.  Okay.  What does it appear to be to you?
18    A.  It's just a response from Clear TMS+, you know,
19  after she had received the lead from us.
20    Q.  After Clear TMS+ had received the lead?
21    A.  Uh-huh.
22    Q.  Pursuant to they're kind of a verified user with
23  preference and/or being included in the geography?
24    A.  Correct.
25    Q.  Okay.  We can put that away.

Page 43

1    A.  I mean, let me just say, this is an assumption
2  that it was after our lead.  I do know that -- that
3  Clear TMS+ got this lead from us, so -- but I'm just not
4  seeing any -- you know, she doesn't reference
5  TMSTherapyNearMe, but it's a -- it's a fair assumption
6  that it's post.
7    Q.  Fair enough.
8    A.  Yeah.
9    Q.  Thank you for explaining.  It's helpful when you
10  explain exactly what you mean.
11    A.  Yeah.
12    Q.  Okay.  I'm gonna circulate what's gonna be
13  marked as Exhibit 3.
14       (Exhibit No. 3 marked.)
15  BY MR. SIMPSON:
16    Q.  Please download, open and review, to your
17  satisfaction, the document that's been marked as
18  Exhibit 3.
19    A.  Okay.
20       (Reviews exhibit.)
21       Yes, uh-huh.
22    Q.  Okay.  Start with the bottom here.
23       Well, first of all, do you recognize the
24  document?
25    A.  I do.

Page 44

1    Q.  Okay.  What do you recognize it as being?
2    A.  This is a Jason -- who's actually my son.
3    Q.  Oh, family affair.
4    A.  Yes.
5       He's no longer with the organization, but
6  anyway, he sent this lead to Clear TMS+.  And she
7  responded...
8       (Reviews exhibit.)
9       Okay.  Yeah, so she's -- and then Ms. Wilcox is
10  making clear that she doesn't want other people clients,
11  and so she's basically saying don't -- don't send other
12  patients that come in from your general form fills,
13  don't include me in those referrals.
14       And... yeah, she said this gentleman wants to be
15  treated at this specific clinic.  I don't know what
16  she's referring to, but -- and they're a good clinic;
17  they will call him.
18       Yeah.  Yeah, so she -- she was clear that she
19  did not want to -- the only leads that she wanted were
20  leads that came directly to her profile.
21    Q.  Have you ever had a registrant on your website
22  make that request before, to your knowledge?
23    A.  No.  No.
24    Q.  Do you recall whether or not your organization
25  acted upon that request?

Page 45

1    A.  As far as I know, yes.  I mean, Jason was the
2  only employee at that time working on lead management,
3  and so he would have done his best not to provide
4  another lead to her.  Not to say that he didn't
5  accidentally do it, but he was pretty good at knowing,
6  you know, and honoring those requests.
7    Q.  And so every lead that passed through at this
8  time would have gone through Jason; is that right?
9    A.  Yes.
10   Q.  Okay.  And we see here the name Alicia Carter
11 here at page 204.
12      You see that?
13   A.  Page 204?
14   Q.  Page 2 of 4.
15   A.  Oh, 2 of 4.  Okay.  Just a minute.  Yeah, I
16 wasn't down there.  Okay.
17      (Reviews exhibit.)
18   Q.  And there's an email from what I assume was
19 Jason to Diana Wilcox, January 30th, 2025, at 12:57 PM.
20 There's three names there.
21      You see that?
22   A.  Yeah, yep.  Yes.
23   Q.  Okay.  And it looks like Alicia Carter, whose
24 declaration we were just looking at, same name here
25 under the entry for January 16th, 2025; right?

Page 46

1    A.  Yes.
2    Q.  Okay.
3       All right.  We're gonna move to the hourly
4  break -- it's the bottom of the hour, so we're gonna
5  take our hourly here, and we'll be back in 10 minutes
6  and we'll be looking at the same document.
7    A.  All right.
8    Q.  Thank y'all.
9       MR. SIMPSON:  Let's go off the record
10 please, Ms. Hamilton.
11         (A break was taken
12         from 10:28 AM to 10:43 AM.)
13 BY MR. SIMPSON:
14   Q.  Before we took a brief break here, which will be
15 our last break of this deposition, we were looking at
16 Exhibit 3.  Can I ask you to pull Exhibit 3 back up to
17 your attention.
18   A.  Yes.
19   Q.  Okay.  And Jason Hornback, that's your son?
20   A.  That's correct.
21   Q.  All right.
22      Okay.  I'll draw your attention to... the page 3
23 of 4 of this PDF where Jason says, "My dev is working on
24 this and should be resolved -- and should be resolve
25 soon.  I'll keep you posted."

Page 47

1       Do you recall what he was talking about?
2       You can feel free to review.
3    A.  I'm sorry, I was reading one of the emails.  Say
4  that again, please.
5    Q.  Do you remember what issue he was talking about
6  resolving with the developers?
7    A.  Where is it again?  On 3?
8    Q.  Yes.
9    A.  The title issue?
10   Q.  Uh-huh.
11   A.  Let me see.  "Can you please send me... print
12 screen.  Can you provide me a list of clients' contact."
13      So that was sent...
14   Q.  What appears to me that Diana Wilcox was asking
15 for some information suggesting she was a doctor to be
16 removed; correct?
17   A.  Well, I'm -- I'm reading that trying to figure
18 it out.
19   Q.  Okay.  Take your time.
20   A.  Okay.  Here we go.
21      Oh, just a moment.  Sorry, I need to find my
22 husband.  My puppy.
23   Q.  You're muted.
24   A.  Yeah, I was talking to my husband asking him to
25 come get the puppy.

Page 48

1    Q.  Okay.  Let me know whenever you're ready.
2    A.  Okay.
3       Yeah, so he's -- she's asking to have the
4  "doctor" portion removed, because she's a -- she's a
5  nurse practitioner.
6    Q.  Right.  And it's important to be accurate about
7  her titles, she's not misrepresenting that she's a
8  doctor?
9    A.  Correct.  Correct.  And that was our error.
10   Q.  All right.  I want to draw your attention up a
11 little bit to Ms. Wilcox's email.  Begins at the very
12 bottom of the first page of the PDF and goes into the
13 second page.  January 30, 2025, at 1:07 PM, Diana Wilcox
14 writing, "Perfect.  Now, in order to make things clear
15 in my mind, these clients specifically clicked the link
16 for Clear TMS+.  They did not come from them clicking
17 another provider's link and then they were routed to us
18 according to your platform's algorithm that we do not
19 have any control over.  So the question is:  Did these
20 clients specifically click our link, or were they routed
21 from other providers according to your platform setup?"
22      Okay.  Do you recall your company, through your
23 son, receiving this email from Ms. Wilcox?
24   A.  I -- I don't specifically, no.
25   Q.  Okay.

12  (Pages 45 to 48)

Page 49

1     A.  Not that one.
2     Q.  Do you recall your son ever bringing it to your
3  attention?
4     A.  No.
5     Q.  Okay.  Sitting here today, what do you believe
6  Ms. Wilcox to be conveying to your son on January 30th?
7     A.  She, again, was concerned that a potential
8  patient lead was going to another profile, and we were
9  using that lead from someone else's profile to give to
10  her.
11        Now, again, that's sort of a gray area, because
12  there -- they can click on a nonverified profile, and
13  that lead goes to Jason, and then he in turn gives it to
14  three people.  So it looks like to me that Jason did not
15  have a real clear conversation with her about how our
16  leads are managed from nonverified profiles.
17        She's looking at our platform as very black and
18  white in terms of there are other profiles and, you
19  know, if there's a form fill on another profile, then it
20  should just go directly to that clinic, and that is true
21  if they're a subscribed clinic.  So... but she -- you
22  know, she is -- wants to make very clear that she does
23  not want to benefit from -- or to have any interaction
24  whatsoever from a potential patient that has clicked on
25  another provider's profile.

Page 50

1        Now, after this, whether it was a verified
2  profile or not, Jason should not have sent her a shared
3  lead from another profile, whether it was, like I said,
4  a verified listing or not, because she's emphatic that
5  she does not want any lead other than the ones that come
6  directly to her profile.  And in that instance,
7  technically, she would never hear from Jason again.  But
8  it looks like he did send her another lead on 11/22,
9  Lindsay Burton.
10     Q.  Right.  Because leads that she's getting from
11  her own profile should go directly to her without going
12  through your companies at all -- correct? -- because
13  she's got a verified profile?
14     A.  Yes.  Now, again --
15     Q.  Go ahead.
16     A.  Again, you know, she -- yes, she can, because
17  she has a verified profile, she can also participate in
18  leads that come in through general form fills.
19        So let me -- let me correct myself.  Jason did
20  not send her another lead after that email that she
21  sent.  So that was sent on January the 30th, and her
22  last lead from us, from the general form fills, which
23  include nonverified listings, the last one was submitted
24  on 1/22, which was prior to that clarifying email from
25  her.

Page 51

1     Q.  Okay.  And a moment ago you said that it seemed
2  to you that Jason didn't have a clear conversation about
3  unverified profiles.
4        What made you say that?
5     A.  I'm just not seeing it here.
6     Q.  Okay.
7     A.  And I don't think he had a phone call with her.
8  So, yeah, I'm not seeing him explain how she's getting,
9  you know, leads from someone else's, quote, profile, but
10  it was not a verified profile; it was a placeholder
11  listing.
12     Q.  Right.  And he does respond to her above;
13  correct?
14     A.  Yes.
15     Q.  And he says, "Lindsay Burton used the form on
16  your profile."
17     A.  "The others were directed to you from either a
18  contact form, insurance verification form, or free
19  listing form."
20        So she did -- he did not include here that it
21  could have also come from a -- oh, no, he did, a free
22  listing.  So he -- so we're using the term now
23  "placeholder listing," but then, back then, we did use
24  it as a free listing, so he did explain that.  I stand
25  corrected.

Page 52

1     Q.  Well, he said it came from a free listing form,
2  yeah.
3     A.  Yeah.  Which would be a nonverified profile
4  form.  Same thing.
5     Q.  And below she had asked, "In order to make
6  things clear in my mind, these clients specifically
7  clicked the link for Clear TMS+.  They did not come from
8  clicking other providers' link and they were routed to
9  us according to your platform's algorithm."
10        And do you feel like --
11     A.  Yes.
12     Q.  -- he sufficiently responded to her question?
13     A.  I do.  Now, whether she understood what a free
14  listing form is, you know, that's subjective.  There's
15  not great clarity there, but... so in Jason's mind, I
16  can see that he's saying, you know, nobody -- your leads
17  are not coming from another verified listing; they're
18  coming from A, B and C, which are -- according to our
19  protocol, are all areas of general form fills.
20     Q.  All right.  If we go up to the top email from
21  Ms. Wilcox, do you see her response on January 31st,
22  2025, where she says, "No problem.  I don't want other
23  people's clients, just whatever comes using your
24  platform."
25        Do you think that she understood what free --

Page 53

1    does it seem to you, reading this now, that she
2    understood what "free listing" meant?
3        A. I would -- I mean, probably not completely, no.
4        Q. All right. And a moment ago you said that the
5    last referral that he provided her was on January 30.
6    There's another one up here on January 31st at 2025 at
7    9:43 AM -- right? -- Joseph Malick? She says, "I just
8    received this lead."
9            So that's another lead?
10       A. Yeah, that's from free listing.
11       Q. Okay.
12       A. Yeah.
13       Q. And what makes you say it's from a free listing?
14       A. Well, it says right here. It says, "Patient
15   leads booked to free listing."
16       Q. Okay. And there's actually a "TMS Center" title
17   in this referral; correct?
18       A. (Reviews exhibit.)
19           So is this from Jason? Let's see, yeah. Let
20   me -- give me just a minute.
21       Q. Sure.
22       A. (Reviews exhibit.)
23           Okay. So in this instance, this is where, you
24   know, our priority is patient care; right? So Jason
25   wants to make sure that this patient gets a clinic. So

Page 54

1    there was a clinic that he tried to refer this patient
2    to that was, you know, seven miles, which was in a good
3    radius. But hers was very close, and he was not able to
4    get a response from that clinic. So he -- he's
5    ethically charged with a responsibility to try to
6    connect this patient to a clinic that can provide
7    services.
8            So he's telling her, you know, I tried to reach
9    out to this other clinic, but there's been no response,
10   so I'm gonna send you this lead. And she has the... the
11   opportunity to service that lead or not. We certainly
12   hope they do, because --
13       Q. Where -- sorry, go ahead.
14       A. Go ahead. I'm sorry.
15       Q. Where on here does Jason say that he tried to
16   contact the first clinic, but he couldn't get ahold of
17   them?
18       A. He said... the -- they inquire -- the inquired
19   center is seven miles from their zip, referring to the
20   patient. Your center is 7.4 miles away. I've tried
21   to -- calling him to see if he's open to receiving
22   treatment from another facility, oh, but he didn't
23   answer. So talking to -- talking about the patient.
24           Going to send this in a form for data purposes.
25   Hmm. Centers that are closest to them. So the inquired

Page 55

1    center... so, again, the inquired center, this is a free
2    lead center, because, again, remember, if this patient
3    had gone to a clinic that had a verified listing, Jason
4    would not see it. It would not come to him whatsoever.
5    So he wouldn't have any opportunity to send the lead to
6    anybody else if he had filled out a form fill on a
7    verified listing.
8        Q. Yeah, I understand that. Does the entrance or
9    the entry here, the data entry of a name TMS Center,
10   does that indicate to you that the patient looking for
11   care had gone to that specific provider's free listing?
12   Is that what "TMS Center" title means?
13       A. Yes.
14       Q. Okay. So your data fill records the unpaid or
15   unverified listing that the inquiring person goes to?
16       A. Correct.
17       Q. And then you provide the alternatives with
18   preference --
19       A. Yes.
20       Q. -- for verified listings and geography; right?
21       A. Yes.
22       Q. Okay. So this patient specifically went to the
23   website entry for the Genuine Health Care PLLC?
24       A. Yes.
25       Q. And does that -- so that's the inquired center;

Page 56

1    correct?
2        A. Correct.
3        Q. And so why would Jason call the patient to see
4    if they were open for receiving treatment from another
5    facility?
6        A. He may have gotten a -- a message from the
7    patient saying that, you know, he hasn't made contact
8    with a clinic. But more importantly, this is a free
9    listing again. Even though the clinic is listed here,
10   it's not a subscribed listing.
11           So this was -- this was where the form fill came
12   from on that listing, but it is not a paid listing. It
13   says right here in the tran-- -- transaction that it's
14   book to free listing, which means that he went to a free
15   listing, and this is the free listing.
16       Q. Do you think that people who use your website,
17   do you think that they have different expectations when
18   they go to a free listing versus a verified listing to
19   inquire about receiving care from a specific healthcare
20   provider?
21       A. Say that again. I'm sorry, I just want to be
22   clear.
23       Q. Sure.
24       A. They have expect -- different expectations when
25   they fill out a form on --

Page 57

1    Q.  I can rephrase it.
2         Do you think it matters to the people who use
3    your website to look for TMS therapy centers whether or
4    not the center they're looking at -- if they're clicking
5    on a link, for example, for Genuine Health Care, do you
6    think that they care -- the user cares whether or not
7    it's a verified listing?
8    A.  No, I don't think they -- they care, no.  No, I
9    don't.
10   Q.  Okay.
11        So does your company have a practice of calling
12   its verified listings to -- to -- or -- sorry.
13        Does your company have a policy of calling
14   inquiring users of your website to see if they're open
15   to receiving treatment from verified users?
16   A.  We have a practice of sending emails to the
17   patients or to the potential patients who inquire to
18   free listings that we have identified three convenient
19   locations in their area for treatment.  And that would
20   include the -- you know, the listing that they went to,
21   which in this case would be the Genuine Health.
22        So we don't do it without informing them.  We
23   don't give them additional information without, you
24   know, sending the email informing them that we are
25   referring them to these other clinics.

Page 58

1    Q.  So how often do you -- does -- do your
2    contractors or employees pick up the phone to follow up
3    with a user to say are you open to receiving treatment
4    from another facility besides the one that you clicked
5    on?
6    A.  We -- we don't do that, no.
7    Q.  But isn't that what Jason says he did that here?
8    A.  Well, I mean, for some reason, I guess, he did
9    there, but it's not a practice.
10   Q.  Okay.  It's not a practice --
11   A.  No.
12   Q.  This seems to be a one-off to you?
13   A.  It's a one-off.
14   Q.  When did you first become aware that Ms. Wilcox
15   had requested that she not receive leads from free
16   listings?  Was it --
17   A.  I first became aware that Ms. Wilcox was having
18   difficulty of some sort legally with our -- you know,
19   related to our website when she wanted -- I think it was
20   a W-9, and I had asked her that -- if she was involved
21   in, you know, legal situation, that I needed to hear
22   from her -- her counsel.  And -- and then -- so she did,
23   and -- and that's when I was contacted by her counsel
24   to -- to get the information.
25   Q.  Okay.

Page 59

1    A.  And I didn't -- I didn't understand it, at that
2    point, what exactly was going on, you know, why there
3    was -- why there was a challenge.  I -- I knew that,
4    just from the conversations, it sounded like she was
5    probably in a noncompete situation and two clinics, you
6    know, got the same lead, which was a standard practice
7    for us, and was certainly, you know, our practice and
8    not her intention.
9    Q.  Is it still your practice?
10   A.  It is still our practice.
11   Q.  And so it was -- it was only after you received
12   information about the lawsuit that you were first made
13   aware of Ms. Wilcox's request to not receive leads from
14   free listings, basically?
15   A.  Right.  And I think shortly after that, she just
16   canceled her -- her subscription entirely.
17   Q.  Do you have any thoughts one way or the other
18   about Ms. Wilcox's request before she canceled her
19   subscription to not receive leads from pay -- unverified
20   or unpaid listings?
21   A.  Well, I don't think she -- I don't think she
22   understood, again, sort of what our practice was.  But I
23   clearly understand that she didn't want any part of, you
24   know, looking like or participating in anything that may
25   look as though she was infringing on a competitor.  And

Page 60

1    we certainly want to honor that.
2    Q.  Do you think that the practice of referring
3    leads from unpaid listings to paid listings does
4    infringe on competition?
5    A.  No, I don't, because I -- you know, as I
6    mentioned before, if you do not have a paid listing, I
7    don't have the -- I don't know that I even have the
8    correct information, and it would be unethical for me to
9    send a lead to a -- to a client or a potential client
10   that does not have a verified listing, not knowing if
11   they're even gonna answer their email.  I don't know if
12   the information is correct.
13        So from an ethical perspective, even though, you
14   know, they're on that site -- and I can see now that I
15   need -- probably need to put more verbiage on there so
16   that the potential patients are clear about what to
17   expect.
18        But from our perspective in managing this
19   delicate population, it's our responsibility to make
20   sure that they get care.  And they're not a competitor
21   on our site if -- if they're not even engaged with us.
22        But, Mr. Simpson, that's exactly why, you know,
23   we are so committed to our subscribers.  We know who
24   that person is in that office that's managing patient,
25   you know, lead referrals.  If we get a message back from

15  (Pages 57 to 60)

Page 61

1  a patient and they're saying no one's contacting me, I'm
2  calling that clinic and saying who's handling these
3  leads? These patients need care.
4      So not only are we in the business of, you know,
5  providing a directory service, we're in the business of
6  making sure that the -- the people that come to our
7  website seeking care get care.
8      You know, from an ethical perspective, you know,
9  first and foremost, I'm a -- you know, I'm a medical
10 therapist professional. You know, I've always been in
11 the business of patient care. So no, it's not -- we're
12 not infringing on anybody if -- if you haven't engaged
13 with us and I don't -- I haven't even had the
14 opportunity to -- to know if that email's even working
15 or if you're checking the emails.
16     You know, unfortunately, in today's day and age,
17 there's so many spam situations out there, and a lot of
18 people aren't aware of the legitimacy of our business,
19 of what we're doing. And the -- the urgent nature of
20 the patients that are on our website, they're not your
21 general patient lead that your typical marketing company
22 might provide.
23     Q.  Thank you.
24     A.  Uh-huh.
25     Q.  We are done with this exhibit.

Page 62

1      All right. I'm gonna look over my notes really
2  quick and see if I have anything left for you, and then
3  we'll be wrapping up shortly.
4      MR. SIMPSON: Let's go off the record for
5  5 minutes, please.
6          (A break was taken
7          from 11:12 AM to 11:20 AM.)
8      MR. SIMPSON: Gonna circulate what's gonna
9  be marked as Exhibit 4.
10         (Exhibit No. 4 marked.)
11     MR. SIMPSON: And Exhibit 5.
12         (Exhibit No. 5 marked.)
13 BY MR. SIMPSON:
14     Q.  We'll start with Exhibit 4. So please let me
15 know when you've had a chance to download, open and
16 review that document.
17     A.  (Reviews exhibit.)
18         Okay.
19     Q.  Okay. Before we do, just want to -- what's your
20 son doing now, Jason?
21     A.  He specializes in antique car restorations.
22     Q.  Interesting.
23     A.  And he is busy with some really great projects.
24     Q.  Is that why he stopped working for your company?
25     A.  Yes.

Page 63

1      Q.  Okay. You had a chance to download, open, take
2  a look at Exhibit 4?
3      A.  I have it in front of me.
4      Q.  Okay. I will represent to you that the first
5  page of this document is a screenshot from a test run
6  submission on your website made by our client, Dr. David
7  Penner.
8          You see that?
9      A.  Yes.
10     Q.  Okay. And this was the unverified directory
11 entry for Dr. David -- or -- sorry -- David Penner MD
12 PLLC; correct?
13     A.  Uh-huh.
14     Q.  And --
15     A.  Correct.
16     Q.  The comments here says, "I'd like to book an
17 appointment with Dr. Penner. Thank you."
18         Right?
19     A.  Let me increase the size of this so I can see
20 it.
21     Q.  Yeah. It is tiny.
22     A.  (Reviews exhibit.)
23         Oh, gosh. Where is it. Okay.
24     Q.  Still on page 1 of 4 of the Word document. It's
25 in the comments section --

Page 64

1      A.  Okay.
2      Q.  -- form.
3      A.  (Reviews exhibit.)
4          Okay.
5      Q.  All right. You see what I'm talking about in
6  regards to the comments section?
7      A.  Where is... yes. Yes, I see that.
8      Q.  Okay.
9          All right. I'm gonna draw your attention to
10 page 2 of 4 here.
11     A.  Uh-huh.
12     Q.  And, first of all, do you recognize the
13 documents of page 2 of 4, this capture of an email?
14     A.  Yes.
15     Q.  Have you seen it before?
16     A.  I haven't seen this one, but I -- but I see it,
17 yeah.
18     Q.  Okay.
19     A.  I'm familiar with this protocol.
20     Q.  Okay. And what's the protocol?
21     A.  It looks like... looks like that there was an
22 attempt to -- Jason recognized that he wanted to make an
23 appointment with Dr. Penner specifically, but he wasn't
24 able to reach him, so he sent his inquiry to NeuroStim
25 TMS as well.

16 (Pages 61 to 64)

Page 65

1      Q.   Is there any steps that Jason should have taken
2   to attempt to reach Dr. Penner according to protocol?
3      A.   Yeah, he already did. He... let's see. It
4   looks like he made -- he said he was unable to reach
5   him, so either attempted to reach him by email and/or
6   email and phone, you know, because the inquirer wanted
7   to make an appointment specifically for Dr. Penner. And
8   so he clearly did his due diligence to try to -- to get
9   him scheduled for that appointment.
10     Q.   Do you know why he was unable to reach him?
11     A.   No.
12     Q.   Why Jason was unable to reach Dr. Penner?
13     A.   Huh-uh.
14     Q.   Do you know whether or not Jason attempted to
15   look up updated contact information for Dr. Penner
16   online?
17     A.   I wouldn't know that.
18     Q.   Would that be part of protocol?
19     A.   It would be, yeah.
20     Q.   So what would the protocol be with regards to
21   that?
22     A.   Typically, we don't call the doctor -- doctor's
23   office. Sometimes, you know, if they just have time to
24   do it, they will. But usually it's a -- it's an email
25   attempt. But clearly Jason, you know, made an -- made a

Page 66

1   real effort to -- to contact Dr. Penner's office.
2     Q.   What makes you -- what's your basis for that
3   conclusion?
4     A.   Well, because he said that he did. This is --
5   this is really going above and beyond. Typically, our
6   emails are scripted. So he constructed a personal email
7   to this inquirer.
8     Q.   Do you know whether or not Dr. Penner and his
9   clinics had contact information, including email
10   addresses, that were available online on December 2nd,
11   2024?
12     A.   I don't know that.
13     Q.   You don't know whether or not Jason attempted to
14   look up updated information in attempt to contact
15   Dr. Penner again?
16     A.   I don't know that. But I can see here that he's
17   got his phone number.
18     Q.   Do you know what NeuroStim TMS is?
19     A.   Yes, they are a TMS provider.
20     Q.   Okay. And so why are there only two referrals
21   here as opposed to three, to your knowledge?
22     A.   I would say, if I were Jason, you know, that
23   this is sort of -- this is not your norm here, when
24   they're on a -- on a free listing, that they would
25   specify that they wanted an appointment specifically for

Page 67

1   Dr. Penner. So he probably just wanted to make one more
2   referral since, you know, he's not looking for a
3   multitude of referrals, try this one, see if you can
4   make contact. So it was a little out of protocol, but
5   the whole thing was kind of out of protocol from the
6   beginning.
7     Q.   Why is that?
8     A.   Because on free listings, they don't typically
9   specify in comments that they want an appointment with
10   Dr. Penner.
11     Q.   But they are clicking on -- they are clicking on
12   the entry for a specific provider's --
13     A.   That's --
14     Q.   -- registry; correct?
15     A.   That's true. That's true. By on TMS, they're
16   typically not -- they're looking for TMS treatment
17   service, not necessarily an appointment with a
18   psychiatrist.
19     Q.   And here, according to this email, Jason was
20   completely unable to get in hold -- ahold of
21   Dr. Penner's office; correct?
22     A.   Correct.
23     Q.   And so he provided only one alternative clinic?
24     A.   Right.
25     Q.   Correct?

Page 68

1     A.   That's correct.
2     Q.   And you said ethically, earlier, requires
3   providing multiple choices so you're not steering
4   potential patients to one clinic; correct?
5     A.   That's correct.
6     Q.   Okay. So is Jason out of compliance with your
7   ethics?
8     A.   Not at all.
9     Q.   Please explain.
10     A.   Well, ethically, you know, it's more than one,
11   but, again, this inquirer was very specific, and this is
12   unusual on a free listing or on a placeholder listing
13   to -- to have someone specify. So he's -- first of all,
14   he's not -- he's not making a referral to Dr. -- he's
15   not making an arbitrary referral or a new blind referral
16   to Dr. Penner. This patient has requested this -- this
17   particular provider.
18        Now, would I have preferred for him to give two
19   more clinics? Yes. Is he out of compliance? Not
20   really, because he's -- you know, there's -- there's two
21   clinic options there. So no, he wouldn't be out of --
22   out of compliance.
23     Q.   Okay. Can I draw your attention --
24     A.   Now --
25     Q.   Go ahead.

17 (Pages 65 to 68)

Page 69

1    A.  I was just reiterating, not preferred, but not
2  out of compliance.
3    Q.  Okay.  Thank you.
4       Would you please go to the next page of this
5  document, which is gonna be page 3 of 4 of the Word
6  document.
7    A.  Okay.
8    Q.  And do you see here --
9    A.  Yep.
10   Q.  -- it looks like Olympia NeuroStim contacted the
11 inquirer?
12   A.  Uh-huh.
13   Q.  Monday, December 2nd, 1:52 PM?
14   A.  Yes.
15   Q.  And you can scroll up.  It's just two or three
16 hours after --
17   A.  Uh-huh.
18   Q.  -- the email from Jason to the inquirer;
19 correct?
20   A.  Right.
21   Q.  So I assume that Neuro -- Olympia NeuroStim TMS
22 must be a paid subscriber then?
23   A.  I would think so, yes.
24   Q.  Because, otherwise, they wouldn't have gotten
25 the referral at all; right?

Page 70

1    A.  That's not -- that's not necessarily true, no.
2  We do make referrals for -- for non -- nonsubscribed
3  listings.
4    Q.  Yeah, but the providers don't get the
5  referrals -- right? -- it's the patients that get the
6  referrals?
7    A.  No, the providers do too.
8    Q.  Oh, okay.  So you contact the providers and say
9  we've made a referral --
10   A.  Yes, yes.
11   Q.  -- with --
12   A.  Now --
13   Q.  -- whatever contact information you have on
14 file?
15   A.  Exactly.  We don't know if they get it
16 sometimes, and sometimes we can see that we sent it, but
17 nobody opened it.  So -- yeah, but clearly she's very
18 responsive, and this is what we like to see.  You know,
19 there's someone that is closely monitoring this email;
20 they have it dialed in; they -- they have a form, you
21 know, a -- a very nice email that they've replied to,
22 and this is the kind of response that we want to see
23 from our subscribed clinics.
24   Q.  Did you as a company at this point -- after --
25 after this point care which provider between the two

Page 71

1  this registrant would have been going to for care?
2    A.  I -- I missed something of what you said.  So
3  please --
4    Q.  Sure.
5    A.  -- repeat that.
6    Q.  Did you -- did your company care about the
7  outcome of which of these two potential providers this
8  registrant went to after providing the information and
9  the introductions?
10   A.  Yes, we did care that we did -- we -- you know,
11 when someone makes a specific request, we certainly try
12 to fill that request.  But after he was unable to reach
13 Dr. Penner, then, you know, we move on and refer someone
14 else.  So no, after that, it does not matter.  We just
15 want the patient to get care.
16   Q.  All right.
17      I'm going to ask you to open and review what's
18 gonna be marked as Exhibit 5, which will be the final
19 exhibit of this deposition.  You'll see it's forwarded
20 to me with a time stamp, because I needed to print it
21 out.  Draw your attention down to the emails below.
22   A.  Which one?
23   Q.  The email from UMS [sic] therapy support to
24 uwslothman, which appears to be from Jason.
25   A.  So from support to usslothman [sic]?  Okay.

Page 72

1       (Reviews exhibit.)
2       "Please let me know if you were contacted by
3  them."
4       (Reviews exhibit.)
5       Okay.  So this is probably -- I wasn't sure on
6  the timeline when we started this, but we had
7  implemented follow-up -- an automatic follow-up emails
8  and text for patients and referents to make sure that
9  they had contacted or had been contacted by a clinic,
10 made contact, were able to get care, and that the clinic
11 was able to reach the referent.  So yes.
12   Q.  Okay.  And so I see here that Jason's only
13 asking about NeuroStim TMS.
14      Do you know --
15   A.  Yes.
16   Q.  -- why he's only asking about whether or not he
17 was able to connect with NeuroStim TMS and start
18 therapy?
19   A.  Yeah, I'm sure because he couldn't reach Penner.
20   Q.  He provided contact information to the
21 patient -- correct? -- for Penner?
22   A.  Yes.
23   Q.  Okay.  And he provided contact information to
24 the patient for TMS therapy; correct?
25   A.  Yes.

18 (Pages 69 to 72)

Page 73

1    Q.  Okay.  And so --
2    A.  So that's -- yeah, either... so I'd have to dig
3  in and find out for sure.  If this was an automated...
4  hmm.  I'm not sure here.  Yeah, this was -- this was
5  probably just Jason -- Jason's discretionary decision to
6  ask about NeuroStim rather than both.
7       I don't -- I wouldn't assign any value in it --
8  on it other than Jason's expectation that he was not
9  able to reach Dr. Penner.
10    Q.  Your follow-up program that you just described
11  rolling out at some point, did that only provide
12  follow-ups for paid subscriber referrals, or did it also
13  provide follow -- automatic follow-ups for unpaid
14  postings as well?
15    A.  Should be unpaid as well.
16    Q.  Okay.
17    A.  Any -- any referral.  So there -- the trigger in
18  those automatic reminders or questions is -- is the
19  referral email, which is also typically under an
20  automated system.  Although we fill in information,
21  it's -- you know, it's a -- it's a workflow.
22    Q.  Okay.  And do you know how much Clear TMS+ was
23  paying for its subscription per month?  Is that --
24  assuming it worked per month.
25    A.  I could look.

Page 74

1       Looks like she was paying 150 a month.
2    Q.  Okay.
3       Okay.  And do registrants provide you guys with
4  keywords or anything that would populate or for -- for
5  their own search engine optimization?
6    A.  No.
7    Q.  You don't help the individual registrants with
8  search op- -- engine optimization at all?
9    A.  We certainly do, yeah.  Linking to our site
10  helps them tremendously, but we do not -- we do not
11  consult or use any of their information for search
12  engine optimization wording or any of that.  We do that
13  in-house.
14    Q.  How much does NeuroStim pay for its
15  subscription?
16    A.  I don't know if I'm at liberty to disclose that.
17  And they're -- they're part of a really big group.  So
18  we do give multiclinic discounts.
19    Q.  Okay.  Well, tell me what the undiscounted rate
20  would be for their subscription package.
21    A.  Well, you know, it depends on which -- which
22  clinic.  I mean, I'd have to look at all of their
23  clinics to see what -- you know, some people choose
24  standout listings; some people choose feature; some
25  people choose some standout, some featured.  So I have

Page 75

1  to -- I'd have to review the account.  I'm confused as
2  to why you would ask me about that.
3    Q.  I'm just asking your standard rates for your
4  subscriptions per month.
5    A.  Well, the standard rate is -- per standout
6  listing is now 149, and the featured listing I believe
7  is 79.  We went through some rate adjustments a while
8  back, and Jason managed that, so I wasn't -- I'm not
9  sure when exactly that happened.  But those are the
10  standard rates.
11    Q.  And if there's 15 locations, for example, do
12  they pay for 15 different packages?
13    A.  No, we put 'em all in one package.
14    Q.  Uh-huh.
15    A.  But they would have 15 different profiles, yes.
16    Q.  All right.  I want to thank you for your time
17  today and for getting us so close to noon.  Appreciated
18  your -- your time and your thoroughness of your answers.
19       MR. SIMPSON:  At this point I'm happy to
20  close this deposition, and we'll go off the record, and
21  we'll order.
22       THE WITNESS:  Okay.  Thank you.
23       MR. SIMPSON:  Thank you.
24       (Deposition concluded at 11:41 am)
25  (Reading and signing was not requested pursuant to FRCP

Page 76

1            Rule 30(e).)
2
3               -o0o-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 77

```
 1              C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON
 4    COUNTY OF KING
 5
 6         I, Kathleen Hamilton, a Certified Shorthand
 7    Reporter and Notary Public in and for the State of
 8    Washington, do hereby certify that the foregoing
 9    transcript of the deposition of SUZANNE JESSEE, having
10    been duly sworn, on OCTOBER 10, 2025, is true and
11    accurate to the best of my knowledge, skill and ability.
12         IN WITNESS WHEREOF, I have hereunto set my hand
13    and seal this 23RD day of OCTOBER, 2025.
14
15
16
17
18
19
20
21
22
23    _____
24         KATHLEEN HAMILTON, RPR, CRR, CCR #1917
25
```

20  (Page 77)

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 78

## A

**Aaron** 3:13
**ability** 6:13 11:6
  77:11
**able** 17:23 25:15
  38:14 54:3 64:24
  72:10,11,17 73:9
**access** 32:6
**accidentally** 45:5
**accommodate** 6:5
**accomplish** 28:9,10
**account** 33:19
  34:12 75:1
**accurate** 35:10,14
  48:6 77:11
**accurately** 5:14
**achieve** 13:5,8,10
  13:13,17 41:2
**acted** 44:25
**acting** 10:16 14:15
**action** 31:3,8
**active** 7:23 17:23
**actively** 38:1
**ad** 28:16,19
**addiction** 9:3,9
  12:10,10,16,19,19
**addition** 9:24
**additional** 23:24
  57:23
**address** 23:20
**addresses** 66:10
**adjustments** 75:7
**ads** 28:17,18
**advantage** 18:23,23
  38:23
**affair** 44:3
**age** 61:16
**ago** 8:1,21 24:12
  51:1 53:4
**agreement** 11:7
**ahead** 50:15 54:13
  54:14 68:25
**ahold** 54:16 67:20
**al** 3:13
**algorithm** 48:18
  52:9

**Alicia** 3:10 30:10
  37:1 45:10,23
**allow** 38:24
**allows** 11:8
**alternative** 67:23
**alternatives** 55:17
**and/or** 42:23 65:5
**Anew** 10:22
**answer** 6:6 10:7
  11:14 54:23 60:11
**answered** 38:2
**answering** 5:9
**answers** 11:19
  75:18
**antique** 62:21
**anxiety** 12:4
**anybody** 7:5 14:24
  42:14 55:6 61:12
**anymore** 39:10
**anyway** 44:6
**apologies** 29:10
**appear** 42:17
**appearing** 1:17 2:2
  23:13
**appears** 3:17 35:20
  47:14 71:24
**applications** 12:9
**appointment** 37:11
  63:17 64:23 65:7
  65:9 66:25 67:9
  67:17
**Appreciated** 75:17
**arbitrary** 68:15
**area** 17:5 18:19,25
  19:19 20:24 25:15
  49:11 57:19
**areas** 40:8 52:19
**ARTHUR** 2:3
**arthurs@rockela...**
  2:6
**article** 24:4,5,20
**asked** 52:5 58:20
**asking** 5:8,17 47:14
  47:24 48:3 72:13
  72:16 75:3
**assign** 73:7

**assistance** 31:6
**assistant** 33:20
**associated** 34:13
  40:15
**assume** 8:25 40:3
  45:18 69:21
**assumed** 37:9,10
**assuming** 34:16,17
  35:4,19 37:2,6
  73:24
**assumption** 43:1,5
**attempt** 64:22 65:2
  65:25 66:14
**attempted** 39:16
  65:5,14 66:13
**attention** 23:6
  41:13 46:17,22
  48:10 49:3 64:9
  68:23 71:21
**attractive** 21:10
**August** 27:19
**authority** 23:16
**automated** 73:3,20
**automatic** 72:7
  73:13,18
**Autotrader** 13:25
**available** 66:10
**avoid** 6:21 17:15
**aware** 16:10 57:4
  58:17 59:13 61:18

## B

**B** 52:18
**bachelor's** 9:12,14
  9:15,18,24
**back** 10:20 14:14
  19:7 25:9 27:4
  28:23 30:22 31:6
  32:5 42:3 46:5,16
  51:23 60:25 75:8
**back-link** 24:5
**back-links** 24:16
**background** 8:21
  12:16 14:8,16
**based** 20:4 38:18
**basically** 14:4 39:4

  44:11 59:14
**basis** 28:15 66:2
**bear** 10:5
**beat** 5:16
**began** 24:12
**beginning** 67:6
**Begins** 48:11
**begun** 24:8
**behalf** 22:3 23:16
  28:19
**Behavioral** 11:2,12
**believe** 22:6 32:14
  34:3,19 49:5 75:6
**believed** 36:16
**benefit** 25:17 49:23
**benefits** 18:20 21:8
  21:11
**best** 5:12 8:15 11:5
  11:20,24 26:3
  39:24 45:3 77:11
**better** 32:2 38:22
**Betty** 7:22 8:23 9:9
**beyond** 23:24 66:5
**big** 74:17
**bit** 8:20 21:17,25
  23:23 48:11
**black** 49:17
**blind** 68:15
**blocked** 39:7
**book** 56:14 63:16
**booked** 53:15
**booking** 37:11
**boost** 24:21
**bottom** 43:22 46:4
  48:12
**bounce-back** 39:14
  39:17
**box** 22:12
**break** 5:24 6:1,3,8
  21:17,21 34:8
  46:4,11,14,15
  62:6
**breaks** 5:18
**Breanna** 32:7
**brief** 8:20 27:20
  46:14

**briefly** 11:5
**bringing** 49:2
**build** 15:15 28:1
**Burton** 50:9 51:15
**business** 6:17 10:10
  10:12 13:4,11,23
  13:17,19,23 14:3
  61:4,5,11,18
**busy** 62:23
**buy** 24:11 28:18
**bypasses** 31:12

## C

**C** 2:1 52:18 77:1,1
**C-e-s-s-o-n** 27:15
**cadence** 5:18
**California** 1:20,25
  4:1,9,14 7:2
**call** 25:4 26:13,19
  28:8 32:5 44:17
  51:7 56:3 65:22
**called** 27:14
**calling** 54:21 57:11
  57:13 61:2
**campaign** 26:13
**canceled** 59:16,18
**capacities** 12:24
**capacity** 13:7
**capture** 5:14 11:22
  31:15 64:13
**car** 62:21
**care** 13:3 53:24
  55:11,23 56:19
  57:5,6,8 60:20
  61:3,7,7,11 70:25
  71:1,6,10,15
  72:10
**career** 12:14 13:18
  14:5
**cares** 57:6
**Carter** 3:10 30:10
  30:20 36:24,25
  37:1 45:10,23
**case** 1:6 5:6 7:18,21
  8:14 18:9 27:12
  35:4,8,20 57:21

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 79

catch 11:23
CCR 1:24 77:24
center 1:5 7:23
36:6 37:8,12
39:14 53:16 54:19
54:20 55:1,1,2,9
55:12,25 57:4
centers 54:25 57:3
CEO 10:16 14:15
certainly 14:11
54:11 59:7 60:1
71:11 74:9
certifications 10:2
Certified 4:7,15
77:6
certify 77:8
Cesson 27:14,16
cetera 6:2 11:22
challenge 59:3
chance 5:13 6:1
62:15 63:1
change 21:25
charged 54:5
chat 6:11 22:12
check 32:14 39:19
checking 61:15
chemical 12:24,25
choice 17:14
choices 68:3
choose 74:23,24,25
circulate 22:12
28:24 43:12 62:8
clarifying 50:24
clarity 52:15
clear 1:9 22:7 31:19
36:23 38:15 39:25
42:18,20 43:3
44:6,10,18 48:14
48:16 49:15,22
51:2 52:6,7 56:22
60:16 73:22
cleared 12:11
clearly 59:23 65:8
65:25 70:17
click 48:20 49:12
clicked 32:21 36:4

37:7 48:15 49:24
52:7 58:4
clicking 48:16 52:8
57:4 67:11,11
client 6:20 8:6
20:10 60:9,9 63:6
clients 37:25 44:10
48:15,20 52:6,23
clients' 47:12
clinic 8:23 17:20,21
18:14 24:4 25:11
25:14,17,22 33:11
36:13 37:17,20
38:4 40:6 44:15
44:16 49:20,21
53:25 54:1,4,6,9
54:16 55:3 56:8,9
61:2 67:23 68:4
68:21 72:9,10
74:22
clinic's 17:2
clinics 13:15 16:3,9
16:19,22 17:4
19:18 24:7,10,14
26:8 27:1 38:24
40:3,9,10,11,20
40:24 41:3,8
57:25 59:5 66:9
68:19 70:23 74:23
close 8:3 19:24 54:3
75:17,20
closely 70:19
closest 20:17 54:25
Code 20:16
coffee 6:2 21:16
colorful 21:9
come 7:7 10:20
17:3 30:25 31:11
32:3 42:13 44:12
47:25 48:16 50:5
50:18 51:21 52:7
55:4 61:6
comes 52:23
coming 52:17,18
comments 63:16,25
64:6 67:9

committed 60:23
communications
9:16 14:2
companies 14:12
50:12
company 1:5,10
14:16,20,22 15:1
15:25 18:15,16
23:17 27:13,14,25
39:16 48:22 57:11
57:13 61:21 62:24
70:24 71:6
competition 60:4
competitor 59:25
60:20
completely 5:21
53:3 67:20
compliance 68:6,19
68:22 69:2
complicated 28:6
computers 6:18
concerned 49:7
concluded 75:24
conclusion 66:3
conditions 12:5,8
13:1,2
confused 75:1
connect 54:6 72:17
consideration 20:8
20:18,19,23
considering 19:4
constructed 66:6
consult 74:11
contacted 58:23
69:10 72:2,9,9
contacting 61:1
content 28:18
contents 30:4
continue 21:24

41:6
contract 11:9 17:3
19:17 32:3 33:2
contractors 15:5,6
15:7 58:2
contractual 11:7
contradicting
30:14
control 48:19
convenience 5:7
convenient 20:1,22
57:18
conversation 5:19
11:19 38:12,13
49:15 51:2
conversations 59:4
conveying 49:6
cooccurring 12:25
correct 7:11 12:16
12:17,21 15:21
18:6 19:23 22:8
23:20,21 27:8,11
32:24 33:7,24
40:16 41:12 42:24
46:20 47:16 48:9
48:9 50:12,19
51:13 53:17 55:16
56:1,2 60:8,12
63:12,15 67:14,21
67:22,25 68:1,4,5
69:19 72:21,24
corrected 51:25
counsel 4:6,16
58:22,23
counselor 9:4
count 38:11
country 25:23
COUNTY 77:4
couple 16:22
course 6:22 31:7
court 1:1 4:8,15
5:11,13,25 11:22
crash 28:14
create 24:15
crisis 38:1
critical 37:22

CRR 1:24 77:24
CSR 1:25

___

**D**

d/b/aOLYMPIA
1:5
dabbling 14:1
daily 28:11 41:6
data 18:24 32:4
54:24 55:9,14
date 1:23 33:15
daughter 14:23,24
32:7
David 1:4,5 2:9
3:12,13 33:14
41:23 63:6,11,11
day 61:16 77:13
day-to-day 6:17
28:15
dba 27:6
December 66:10
69:13
decision 73:5
declaration 3:10
30:10 42:1 45:24
dedicated 32:1
defendant 22:5
Defendants 1:11
definitely 19:20
degree 9:1,2,6,11
9:12,14,17,18,25
degrees 9:23
Delaware 14:19
delicate 60:19
demonstrate 31:7
depend 33:6
dependency 12:24
12:25
depends 19:23 21:2
74:21
deposed 7:11,13,19
deposition 1:12 3:1
3:9 5:2,23 6:4,19
6:21,23 8:1,15,17
22:1,24 46:15
71:19 75:20,24

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 80

77:9
depositions 11:18
depression 12:4
describe 11:5 25:7
described 19:15
30:10 73:10
describing 30:12
desk 28:13
desktop 22:22
dev 46:23
develop 14:12 24:6
28:18,18
developers 14:11
47:6
developing 24:8
development 13:4
13:10,19,23 14:3
14:10 15:11 24:14
device 12:3
dialed 70:20
Diana 3:11 22:6,7
45:19 47:14 48:13
DianaWilcox 1:10
difference 21:4
different 12:8,24
13:2 15:8 16:22
22:10 56:17,24
75:12,15
difficulty 58:18
dig 73:2
diligence 38:10
65:8
direct 26:19 38:20
directed 51:17
directly 17:21
18:13,14 19:11
20:10 31:2,14,20
33:5 36:13,17
37:17,19 44:20
49:20 50:6,11
directory 15:22
16:1,2,3,6 18:15
18:15,16 23:25
24:2,3 25:10 61:5
63:10
disclose 74:16

discounts 74:18
Discovery 11:1,12
discretionary 73:5
discussed 9:25
23:25
DISTRICT 1:1,1
doctor 47:15 48:4,8
65:22
doctor's 65:22
document 22:18
23:4 29:22 43:17
43:24 46:6 62:16
63:5,24 69:5,6
documents 6:14,22
23:19 64:13
doing 11:23,23
13:22 32:10 37:3
38:9 61:19 62:20
download 6:13
22:17 29:3 43:16
62:15 63:1
Dr 30:21 31:2,10
31:21,25 32:12,21
32:23 33:5,10,10
33:19 34:12 35:21
36:13 37:15 40:11
63:6,11,17 64:23
65:2,7,12,15 66:1
66:8,15 67:1,10
67:21 68:14,16
71:13 73:9
draw 10:17 23:6
46:22 48:10 64:9
68:23 71:21
drip 26:13
driving 17:15
due 38:10 65:8
duly 4:14 77:10

E

E 2:1,1 4:19 77:1,1
earlier 7:10 12:14
19:15 25:9 27:7
27:10 33:1 35:9
35:14 36:9 38:15
40:23 41:25 68:2

earliest 13:22
early 21:17
Eastern 9:22
educated 13:7
education 8:25
educational 8:21
12:15
efficient 28:10
effort 66:1
efforts 16:11
either 16:10 31:1
31:20 32:9 39:7
42:15 51:17 65:5
73:2
element 28:5
else's 49:9 51:9
em 37:25 75:13
email 3:11,13 22:10
27:2 33:18 34:13
39:8,18 42:10,15
45:18 48:11,23
50:20,24 52:20
57:24 60:11 64:13
65:5,6,24 66:6,9
67:19 69:18 70:19
70:21 71:23 73:19
email's 61:14
emails 47:3 57:16
61:15 66:6 71:21
72:7
emphatic 50:4
employed 10:8
employee 45:2
employees 15:4
17:4 19:18 32:3
33:2 58:2
employment 13:8
endeavor 5:24
25:24
endeavored 25:20
ended 35:9
engaged 60:21
61:12
engine 25:19 28:3
74:5,8,12
engineering 14:9

entirely 59:16
entirety 11:11
entrance 55:8
entrepreneur 14:1
entry 45:25 55:9,9
55:23 63:11 67:12
era 10:22,23,25
error 48:9
et 3:13 6:2 11:22
ethical 17:7 60:13
61:8
ethically 17:9,13
54:5 68:2,10
ethics 20:3 68:7
event 26:14 42:15
eventually 13:3
everybody 5:25
everybody's 5:7
exactly 31:7 43:10
59:2 60:22 70:15
75:9
EXAMINATION
1:13 3:2,3
examined 4:16
example 17:6 20:5
20:14 26:15 57:5
75:11
Excellent 6:16
exclusive 17:23
37:14 38:4
exhibit 3:7,9,11
22:13,14,15 23:8
27:4 28:23 29:1
29:22 30:7,15
41:13,18 42:12
43:13,14,18,20
44:8 45:17 46:16
46:16 53:18,22
61:25 62:9,10,11
62:12,14,17 63:2
63:22 64:3 71:18
71:19 72:1,4
exhibits 3:8 6:10
28:25 29:4
existence 11:12
expect 56:24 60:17

expectation 73:8
expectations 56:17
56:24
expected 39:23
experience 30:9
explain 20:19 25:7
43:10 51:8,24
68:9
explained 25:9
explaining 35:9,14
43:9
exposed 13:1
expound 15:24
extra 5:18

F

F 77:1
facilitate 6:12
facility 54:22 56:5
58:4
fair 43:5,7
familiar 23:3,4
30:9 34:5 41:15
64:19
family 44:3
far 35:3 45:1
FDA 12:11
feature 41:2 74:24
featured 21:1,5
25:3 74:25 75:6
feel 6:4 22:17 29:3
32:17 34:9 47:2
52:10
felt 40:6
field 12:24 16:8
figure 47:17
file 70:14
files 22:4
fill 16:25 17:1,3,18
17:20,20 18:10,13
19:10 20:15 31:1
31:10,22,23 36:12
36:17,21 37:16
49:19 55:6,14
56:11,25 71:12
73:20

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 81

**filled** 20:14 30:21
31:3,10,21,22,23
32:22 37:8 55:6
**filling** 37:11
**fills** 16:23 18:11
19:16 31:4 36:10
36:20 44:12 50:18
50:22 52:19
**final** 71:18
**find** 16:18 22:4,22
25:11 26:6 30:24
31:5,6 34:14
47:21 73:3
**finding** 16:11 34:17
**fine** 7:9
**finish** 5:13,17
35:11
**first** 4:14 13:17
14:17 21:7 22:13
29:18,21 40:17
41:17 42:9 43:23
48:12 54:16 58:14
58:17 59:12 61:9
63:4 64:12 68:13
**flow** 5:19
**focused** 12:15 16:4
**folder** 22:21
**folks** 19:13
**follow** 19:7 58:2
73:13
**follow-up** 72:7,7
73:10
**follow-ups** 73:12,13
**follows** 4:17
**Ford** 7:22 8:23 9:9
**foregoing** 77:8
**foremost** 61:9
**forgot** 11:17
**form** 16:23 17:1,2
17:18,20 18:9,11
18:13 19:10,16
20:15 31:1,3,10
31:22,23 32:22
36:10,12,17,21
37:9,16 44:12
49:19 50:18,22

51:15,18,18,19
52:1,4,14,19
54:24 55:6 56:11
56:25 64:2 70:20
**formality** 23:15
**forwarded** 71:19
**found** 10:23
**founded** 10:22
27:13
**founder** 10:16
**four-page** 23:7,7
**FRCP** 75:25
**free** 6:4 22:17 25:4
25:5 29:3 32:17
47:2 51:18,21,24
52:1,13,25 53:2
53:10,13,15 55:1
55:11 56:8,14,14
56:15,18 57:18
58:15 59:14 66:24
67:8 68:12
**front** 35:10 63:3
**full** 4:22
**full-service** 28:20
**function** 6:11
**functionality** 15:16
28:5

**G**

**gears** 8:19 21:25
**general** 16:22 17:1
17:2,5 27:2 31:22
31:23 36:12 44:12
50:18,22 52:19
61:21
**gentleman** 44:14
**Genuine** 55:23 57:5
57:21
**geographical** 18:18
**geographically**
20:4 40:7,13
**geography** 19:3,23
20:1 21:3 25:14
26:16 38:18 40:9
42:23 55:20
**getting** 50:10 51:8

75:17
**give** 5:12 20:7,8,13
20:18,18,22 24:21
29:13 31:15 33:13
36:4 49:9 53:20
57:23 68:18 74:18
**gives** 18:25 49:13
**go** 5:5 6:7 8:18
18:13,14 19:17
20:10 21:19 31:14
32:22,23 33:1,22
36:13 40:17 41:7
46:9 47:20 49:20
50:11,15 52:20
54:13,14 56:18
62:4 68:25 69:4
75:20
**goes** 17:19,20 18:3
18:7 19:11 48:12
49:13 55:15
**going** 5:8,22,23
16:12 19:12 36:13
36:17 38:2 49:8
50:11 54:24 59:2
66:5 71:1,17
**gonna** 5:5,9,22
6:10 8:19 21:7,24
21:25 22:12,13,13
28:22,25 29:11
43:12,12 46:3,4
54:10 60:11 62:1
62:8,8 64:9 69:5
71:18
**good** 4:21 6:24
44:16 45:5 54:2
**Google** 18:16
**gosh** 13:24 27:17
36:4 40:18 63:23
**gotten** 29:25 30:1
39:2 40:2 56:6
69:24
**grab** 6:2
**Graduate** 9:9
**gray** 49:11
**great** 52:15 62:23
**ground** 5:5

**group** 2:4 13:4
74:17
**groups** 15:8,10
**guaranteed** 37:14
**guess** 15:11,11
22:20 25:22 58:8
**guys** 74:3

**H**

**Hamilton** 1:24
46:10 77:6,24
**hand** 14:11,11
17:17 77:12
**handling** 61:2
**hang** 34:23
**happened** 30:25
75:9
**happening** 32:8
37:6
**happens** 18:3 30:23
36:18 37:4
**happy** 6:5 75:19
**hard** 20:19
**hazard** 7:16
**Hazleton** 9:9
**health** 11:2,13 13:1
17:8 38:1 55:23
57:5,21
**healthcare** 56:19
**hear** 50:7 58:21
**help** 5:6 15:15
28:13 34:14 74:7
**helpful** 32:18,19
34:7 43:9
**helps** 74:10
**hereunto** 77:12
**higher** 9:23 21:6
**highest** 25:2
**hinted** 8:21
**hmm** 8:6 22:24
54:25 73:4
**hold** 21:12 67:20
**holder** 35:24 36:2
**honor** 60:1
**honoring** 45:6
**hope** 54:12

**Hornback** 46:19
**hour** 5:25 31:19
46:4
**hourly** 21:16 46:3,5
**hours** 69:16
**Huh-uh** 8:13 65:13
**husband** 7:7 47:22
47:24

**I**

**ideal** 26:16
**ideally** 25:22
**IDENTIFICATI...**
3:8
**identified** 57:18
**imagine** 28:7
**implemented** 72:7
**important** 17:13
18:16 19:3 48:6
**importantly** 6:22
**in-house** 15:8 17:3
18:13,25 19:11,13
19:13,17 74:13
**inadvertently** 6:22
**include** 15:12 19:13
19:19,20,21,22
44:13 50:23 51:20
57:20
**included** 16:7
40:11,20 41:4
42:23
**including** 12:15
66:9
**income** 10:17
**incorporated** 14:18
14:19
**increase** 63:19
**INDEX** 3:2,7
**indicate** 55:10
**indicates** 31:19
**individual** 1:6,10
24:14 74:7
**industry** 14:2 16:12
**inform** 26:8
**information** 19:12
26:25 31:5 34:10

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 82

34:18 36:14 37:20
37:23 38:5,5 39:2
39:4 40:15 41:10
47:15 57:23 58:24
59:12 60:8,12
65:15 66:9,14
70:13 71:8 72:20
72:23 73:20 74:11
**informed** 37:24
**informing** 57:22,24
**infringe** 60:4
**infringing** 59:25
61:12
**inquire** 16:13,25
54:18 56:19 57:17
**inquired** 54:18,25
55:1,25
**inquirer** 65:6 66:7
68:11 69:11,18
**inquiring** 55:15
57:14
**inquiry** 38:2 64:24
**instance** 30:20 50:6
53:23
**institution** 9:8,20
9:23 17:16
**insurance** 51:18
**intensive** 19:5
**intention** 59:8
**interact** 16:15
**interaction** 31:13
49:23
**interest** 42:11
**Interesting** 62:22
**intermediate** 25:3
**Internet** 18:7
**intimately** 34:5
**introductions** 71:9
**involved** 58:20
**issue** 47:5,9
**issues** 13:1
**it'd** 19:15

**J**
**J-e-s-s-e-e** 4:25
**January** 33:16 35:5

42:2 45:19,25
48:13 49:6 50:21
52:21 53:5,6
**Jason** 44:2 45:1,8
45:19 46:19,23
49:13,14 50:2,7
50:19 51:2 53:19
53:24 54:15 55:3
56:3 58:7 62:20
64:22 65:1,12,14
65:25 66:13,22
67:19 68:6 69:18
71:24 73:5 75:8
**Jason's** 52:15 72:12
73:5,8
**Jessee** 1:15 3:1 4:13
4:21,24 5:3 21:24
77:9
**job** 5:12
**Joseph** 53:7
**July** 11:1 27:19

**K**
**Kathleen** 1:24 77:6
77:24
**keep** 46:25
**ketamine** 16:3
**keywords** 74:4
**kind** 27:20,23
28:14,19 42:22
67:5 70:22
**KING** 77:4
**knew** 59:3
**know** 6:4,17 10:7,7
11:21 12:12 15:12
15:16 16:9,13
17:7,8,15 18:18
18:20,21 19:3
20:5,16,16 24:11
24:21 26:3,12,14
27:20 28:4 29:15
30:6 31:23 32:4,5
34:4,4,11,12
37:11,24 38:18,22
39:8,13,20,21,22
40:7,8,12,19 41:8

42:2,18 43:2,4
44:15 45:1,6 48:1
49:19,22 50:16
51:9 52:14,16
53:24 54:2,8 56:7
57:20,24 58:18,21
59:2,6,7,24 60:5,7
60:11,14,22,23,25
61:4,8,8,9,10,14
61:16 62:15 65:6
65:10,14,17,23,25
66:8,12,13,16,18
66:22 67:2 68:10
68:20 70:15,18,21
71:10,13 72:2,14
73:21,22 74:16,21
74:23
**knowing** 45:5
60:10
**knowledge** 8:17
12:11 31:24 44:22
66:21 77:11

**L**
**label** 12:4,9
**lack** 32:1 38:22
**laptop** 6:12
**large** 13:4
**laughing** 20:20
28:2
**Law** 2:4
**lawsuit** 8:5 59:12
**lawyers** 10:4
**lay** 11:5
**laypeople** 11:8
**lead** 17:22 26:18,21
26:24 31:13,14
36:23 37:21 38:4
38:6,17,20 39:6,7
39:15 40:2 42:19
42:20 43:2,3 44:6
45:2,4,7 49:8,9,13
50:3,5,8,20,22
53:8,9 54:10,11
55:2,5 59:6 60:9
60:25 61:21

**leads** 17:24 26:20
32:2 37:15 38:14
38:19,23 44:19,20
49:16 50:10,18
51:9 52:16 53:15
58:15 59:13,19
60:3 61:3
**learn** 17:7 26:19
**learned** 13:6
**learning** 9:20,24
**left** 13:14 62:2
**legal** 58:21
**legally** 58:18
**legitimacy** 61:18
**let's** 8:23 15:23
20:13 21:19 22:19
30:19 33:18 34:24
36:2 46:9 53:19
62:4 65:3
**letting** 26:14
**level** 25:2,3
**levels** 13:2
**liability** 1:4,9
**liberty** 74:16
**licensed** 9:3 11:9
**limited** 1:4,9
**Lindsay** 50:9 51:15
**link** 24:20 34:13
48:15,17,20 52:7
52:8 57:5
**Linking** 74:9
**list** 18:17 41:6
47:12
**listed** 17:5 26:9
56:9
**lister** 20:7,24
**listers** 38:9
**listing** 3:12 17:2
19:17,19,22 20:15
20:25 21:1,2,5,5,6
21:7,8 24:22,23
25:2,3,4,5,6,8,21
25:21,25 26:16,22
35:1,20,22,24
36:2,15,21,22
37:8,14 38:16,17

39:5,7,11 41:24
41:25 50:4 51:11
51:19,22,23,24
52:1,14,17 53:2
53:10,13,15 55:3
55:7,11,15 56:9
56:10,12,12,14,15
56:15,18,18 57:7
57:20 60:6,10
66:24 68:12,12
75:6,6
**listings** 18:22 19:21
25:11 26:1,10,23
36:7,7,10 37:4,19
50:23 55:20 57:12
57:18 58:16 59:14
59:20 60:3,3 67:8
70:3 74:24
**little** 8:19 21:17,25
22:21 27:17 48:11
67:4
**located** 4:8,13
**location** 19:25
20:10,23
**locations** 20:1,17
20:22 57:19 75:11
**long** 5:23 8:1 13:12
**longer** 39:9 44:5
**look** 18:10 20:16
22:11 27:5 29:18
34:8 57:3 59:25
62:1 63:2 65:15
66:14 73:25 74:22
**looked** 22:9
**looking** 16:24
17:15 34:14 37:25
40:12 41:16,21,22
45:24 46:6,15
49:17 55:10 57:4
59:24 67:2,16
**looks** 41:15 45:23
49:14 50:8 64:21
64:21 65:4 69:10
74:1
**lot** 18:20 28:2,8
37:25 61:17

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 83

## M

**M** 4:19
**mag-** 12:20
**magnetic** 12:2,20
**majority** 26:4
  40:19,23 41:3,5
**making** 44:10 61:6
  68:14,15
**Malick** 53:7
**manage** 28:12
  38:14
**managed** 49:16
  75:8
**management** 45:2
**manager** 33:21
**managing** 11:4,6
  37:21 38:6 60:18
  60:24
**manner** 28:10 38:3
**manufacturers**
  24:9
**mark** 22:14
**marked** 22:13,15
  28:25 29:1,22
  43:13,14,17 62:9
  62:10,12 71:18
**marketing** 13:4,18
  13:22,25 14:3
  15:15,16 16:10
  24:6,9,13,16
  26:20,25 61:21
**marketing/busin...**
  13:10
**master's** 9:1,2,5,11
  9:24
**material** 3:17 24:9
**materials** 24:6,14
  24:16 26:25
**matter** 71:14
**matters** 57:2
**MD** 1:4 3:12 33:14
  41:23 63:11
**mean** 13:24 15:10
  20:12 24:18 32:17
  32:20 33:22 37:5
  37:13 39:17,21

43:1,10 45:1 53:3
  58:8 74:22
**meaning** 20:11
**means** 20:13 24:19
  55:12 56:14
**meant** 53:2
**media** 28:17
**medical** 11:8,9 12:8
  16:5 61:9
**mental** 12:25 17:8
  38:1
**mention** 11:17
**mentioned** 18:1
  38:15 60:6
**message** 56:6 60:25
**Michigan** 9:22
**mile** 19:1
**miles** 54:2,19,20
**mind** 48:15 52:6,15
**mindful** 11:24
**minute** 36:4 45:15
  53:20
**minutes** 46:5 62:5
**Mirage** 1:20 4:1,9
  4:14 7:2
**mislabeled** 29:9
**misrepresenting**
  48:7
**missed** 71:2
**mistake** 35:15
**moment** 8:21 10:20
  21:12 29:14,24
  30:3,17 33:13,17
  42:7,11 47:21
  51:1 53:4
**Monday** 69:13
**monitoring** 70:19
**month** 73:23,24
  74:1 75:4
**months** 41:7
**morning** 4:21 6:2
  28:24
**MOTION** 3:10
**move** 46:3 71:13
**MSO** 11:2,3,11
**multiclinic** 74:18

**multiple** 15:13 40:8
  68:3
**multitasking** 6:18
**multitude** 67:3
**muted** 47:23

## N

**N** 2:1 4:19,19
**name** 4:22,22 10:12
  33:11 36:25 38:6
  45:10,24 55:9
**names** 45:20
**natural** 5:19
**nature** 61:19
**near** 3:9 16:17,19
  70:1
**necessarily** 67:17
  70:1
**need** 5:12 6:2,3
  10:5 11:20,24
  21:15 22:21 25:10
  28:9 34:10,10
  47:21 60:15,15
  61:3
**needed** 58:21 71:20
**needs** 28:11
**Neuro** 69:21
**NeuroStim** 64:24
  66:18 69:10,21
  72:13,17 73:6
  74:14
**never** 50:7
**nevertheless** 5:23
**new** 10:23,25 41:8
  68:15
**nice** 70:21
**nods** 11:22
**non** 70:2
**noncompete** 59:5
**nonsubscribed**
  20:25 26:22,23
  70:2
**nonverbal** 11:19
**nonverified** 18:22
  20:15 36:21 37:4
  49:12,16 50:23
  52:3

**noon** 75:17
**norm** 66:23
**normal** 11:18 16:11
**Nos** 29:1
**Notary** 77:7
**notes** 62:1
**notice** 3:9 22:24
  28:22
**notify** 26:17
**number** 12:8 22:10
  27:5 66:17
**nurse** 48:5

## O

**O** 4:19
**o0o-** 4:3 76:3
**oath** 4:14
**obtain** 9:12
**obtaining** 9:11
**obviously** 5:8 16:17
**occupational** 7:16
**OCD** 12:4
**October** 1:23 4:1
  77:10,13
**offer** 16:3 25:5
  39:10
**offering** 24:10
**offers** 18:21
**offhand** 39:20
**office** 33:20 60:24
  65:23 66:1 67:21
**offices** 15:1
**officially** 10:17
**offline** 34:7
**oh** 7:25 13:24 29:9
  34:21 36:3,4
  40:18 44:3 45:15
  47:21 51:21 54:22
  63:23 70:8
**okay** 5:5,22 6:8,23
  6:25 7:13 8:19
  9:20 10:4,12
  12:14,18,22 13:16
  13:21 16:6 17:25
  17:25 18:3,7 19:9
  20:2 21:14 22:7

22:12 23:2,2,3,6,9
  23:10,12,15,19,22
  27:4,9,12 28:20
  29:8,17,18,20,24
  30:5,8,9,19,19,19
  30:25 33:9,13,13
  34:7,21,25 35:2,4
  35:8,24 36:6,19
  39:23,25 41:13,14
  41:15,20 42:1,7,8
  42:8,9,17,25
  43:12,19,22 44:1
  44:9 45:10,15,16
  45:23 46:2,19,22
  47:19,20 48:1,2
  48:22,25 49:5
  51:1,6 53:11,16
  53:23 55:14,22
  57:10 58:10,25
  62:18,19 63:1,4
  63:10,23 64:1,4,8
  64:18,20 66:20
  68:6,23 69:3,7
  70:8 71:25 72:5
  72:12,23 73:1,16
  73:22 74:2,3,19
  75:22
**old** 41:9
**Olympia** 33:12
  36:6 37:8,12
  39:14 69:10,21
**Omniscience** 39:23
**one's** 61:1
**one-off** 58:12,13
**ones** 50:5
**ongoing** 12:12
  28:11
**online** 16:1 18:16
  65:16 66:10
**op-** 74:8
**open** 6:19 22:17
  43:16 54:21 56:4
  57:14 58:3 62:15
  63:1 71:17
**opened** 70:17
**opening** 13:15

operate 11:8
opportunities 16:3
opportunity 15:23
    26:21 38:21 54:11
    55:5 61:14
opposed 66:21
optimal 25:12
optimization 25:19
    28:4,4 74:5,8,12
option 38:24
options 68:21
ORAL 1:12
order 3:10 38:3
    42:6 48:14 52:5
    75:21
organization 11:4,6
    14:3 15:17 17:16
    26:6 44:5,24
organization's 20:2
organizations
    15:14
originally 31:1
    39:12
outcome 71:7
outside 24:12
overview 27:20
owned 14:13
owner 10:10 14:15
    14:20
owns 14:22

**P**

P 2:1,1
package 74:20
    75:13
packages 75:12
page 3:3,8 23:7
    41:21 45:11,13,14
    46:22 48:12,13
    63:5,24 64:10,13
    69:4,5
pages 3:12,13,14
    28:7
paid 17:23 18:21
    20:9 56:12 60:3,6
    69:22 73:12

paid-for 36:14
    37:14
Parkinson's 12:7
part 14:4,12 59:23
    65:18 74:17
participants 1:17
participate 50:17
participating 59:24
particular 17:1,16
    17:19 18:18 19:4
    25:14 38:8 40:9
    68:17
party 8:4,7
passed 45:7
patient 7:24 13:3
    16:23,24 17:19,24
    19:2,4,16,18
    20:14,21 26:17,20
    31:13 36:20 37:21
    38:14,23 49:8,24
    53:14,24,25 54:1
    54:6,20,23 55:2
    55:10,22 56:3,7
    60:24 61:1,11,21
    68:16 71:15 72:21
    72:24
patients 16:16
    38:10 44:12 57:17
    57:17 60:16 61:3
    61:20 68:4 70:5
    72:8
pay 28:17 59:19
    74:14 75:12
paying 73:23 74:1
payment 22:9
    34:13
PC 6:12
PDF 23:8 46:23
    48:12
PDFs 6:13
pending 6:6
Penner 1:4,5 2:9
    3:12,13 32:12,21
    32:23 33:5,14,19
    34:12 35:21 37:15
    41:23 63:7,11,17

64:23 65:2,7,12
    65:15 66:8,15
    67:1,10 68:16
    71:13 72:19,21
    73:9
Penner's 30:21
    31:2,10,21,25
    33:10,10 36:13
    40:11 66:1 67:21
people 15:14 16:6,8
    18:25 36:23 44:10
    49:14 56:16 57:2
    61:6,18 74:23,24
    74:25
people's 52:23
Perfect 48:14
periodically 7:8
    41:6
person 34:11 38:6
    55:15 60:24
personal 66:6
perspective 17:7
    36:16,18 60:13,18
    61:8
phone 51:7 58:2
    65:6 66:17
physical 15:1
physician 11:7
physicians 13:7
pick 20:3 58:2
picked 19:24
picking 20:2
piece 37:22
Pilot 15:17,19 27:6
    27:21,25 32:5
placed 39:12
placeholder 25:5,6
    25:8,21 26:1,10
    26:15 36:7,10
    37:7 39:5 51:10
    51:23 68:12
placement 21:10
    28:19 35:24 36:2
Plaintiff 1:7 2:2
PLAINTIFF'S 3:10
platform 28:17

48:21 49:17 52:24
platform's 48:18
    52:9
please 4:21 6:4
    21:20 22:17 29:3
    29:19,24 42:5
    43:16 46:10 47:4
    47:11 62:5,14
    68:9 69:4 71:3
    72:2
PLLC 1:4,9 2:4
    3:12 33:14 41:23
    55:23 63:12
plug-in 28:9
plug-ins 15:13
PM 45:19 48:13
    69:13
poach 32:2
point 8:22 12:12
    59:2 70:24,25
    73:11 75:19
policy 57:13
populate 74:4
population 60:19
portal 22:9 31:2
portion 48:4
possibly 25:11
post 43:6
post-high 8:25
posted 26:9 46:25
posting 32:13,21
    34:20 41:21
postings 33:23
    73:14
potential 16:24
    17:19 19:16 20:14
    31:13 36:20 39:15
    49:7,24 57:17
    60:9,16 68:4 71:7
practice 12:19
    15:18,20,22 20:12
    27:6,21,25 32:5
    40:9 57:11,16
    58:9,10 59:6,7,9
    59:10,22 60:2
practices 40:4,5

practitioner 48:5
prefer- 20:22
preference 42:23
    55:18
preferential 20:8
    20:23
preferred 21:10
    37:13 68:18 69:1
preliminary 11:18
preparation 22:1
prepare 22:3 23:20
prepared 5:11
presence 26:5
PRESENT 2:8
presently 10:8,10
presumably 10:7
pretty 45:5
primarily 16:9 21:9
primary 27:9,24
print 47:11 71:20
prior 9:11 23:12
    27:14 50:24
priority 53:24
probably 8:3 20:7
    27:4 41:7 53:3
    59:5 60:15 67:1
    72:5 73:5
problem 52:22
professional 1:4,9
    8:20 9:3 10:2
    13:18 61:10
professions 7:17
profile 16:14 17:2
    17:18,18,19 18:8
    18:15 20:11 30:21
    31:10,14,25 33:7
    40:15 44:20 49:8
    49:9,12,19,25
    50:2,3,6,11,13,17
    51:9,10,16 52:3
profiles 18:4,12
    33:1 41:9 49:16
    49:18 51:3 75:15
program 73:10
projects 62:23
promotion 24:10

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 85

**protocol** 12:3 30:12
52:19 64:19,20
65:2,18,20 67:4,5
**protocols** 5:7
**provide** 15:22
16:20,21 17:11,13
18:24 19:25 23:24
24:4,5,13 27:1
28:11,16 31:8
45:3 47:12 54:6
55:17 61:22 73:11
73:13 74:3
**provided** 13:25
53:5 67:23 72:20
72:23
**provider** 11:10
17:11 56:20 66:19
68:17 70:25
**provider's** 48:17
49:25 55:11 67:12
**providers** 48:21
70:4,7,8 71:7
**providers'** 52:8
**provides** 23:23
**providing** 13:5
16:2 25:12 61:5
68:3 71:8
**proximity** 20:4
**psychiatric** 16:5
**psychiatrist** 67:18
**psychiatrists** 13:5
**Psychiatry** 1:5 37:8
37:12 39:15
**psychology** 9:15
**PTSD** 12:7
**public** 16:15 77:7
**pull** 46:16
**puppy** 47:22,25
**purposes** 54:24
**pursuant** 42:22
75:25
**put** 28:22 42:25
60:15 75:13

**Q**

**question** 5:17 6:6,7

40:22 48:19 52:12
**questions** 5:9 10:4
10:8 11:20 73:18
**quick** 32:15 62:2
**quote** 51:9
**quoted** 3:17

**R**

**R** 2:1 77:1
**R&J** 27:5
**radius** 17:6 19:1
54:3
**Rancho** 1:20 4:1,8
4:13 7:2
**rank** 18:18 25:15
**ranking** 18:17
25:12
**ranks** 21:6
**rate** 74:19 75:5,7
**rates** 75:3,10
**reach** 16:7,12,21
54:8 64:24 65:2,4
65:5,10,12 71:12
72:11,19 73:9
**reached** 31:19
**read** 3:17 6:21 30:3
30:13
**reading** 29:23 47:3
47:17 53:1 75:25
**ready** 48:1
**real** 32:14 49:15
66:1
**realize** 16:18 32:10
**really** 15:14,17
18:22 21:2 25:4
62:1,23 66:5
68:20 74:17
**reason** 31:12 34:2
34:19 41:11 58:8
**reasons** 20:3 37:18
**recall** 8:4,10 29:23
32:9 42:9,14
44:24 47:1 48:22
49:2
**receive** 58:15 59:13
59:19

**received** 9:5,17
39:14 42:19,20
53:8 59:11
**receiving** 48:23
54:21 56:4,19
57:15 58:3
**recognize** 23:10
41:17 43:23 44:1
64:12
**recognized** 64:22
**recollection** 8:16
**record** 4:5,7,23 5:9
5:10 6:7,25 10:6
21:19 46:9 62:4
75:20
**records** 55:14
**refer** 17:4,21 19:18
20:21 36:21,22
54:1 71:13
**reference** 43:4
**referent** 72:11
**referents** 72:8
**referral** 17:9,11
20:9 26:15 31:16
33:4 53:5,17 67:2
68:14,15,15 69:25
70:9 73:17,19
**referrals** 17:10 20:6
20:6 37:22 38:7
44:13 60:25 66:20
67:3 70:2,5,6
73:12
**referred** 20:25 21:1
21:2
**referring** 28:23
44:16 54:19 57:25
60:2
**refers** 25:9
**refill** 21:16
**reflected** 41:18
**regards** 64:6 65:20
**registrant** 44:21
71:1,8
**registrants** 74:3,7
**registry** 25:20 26:9
40:21 41:4 67:14

**rehab** 12:7
**reiterate** 31:9
**reiterating** 69:1
**related** 22:5 28:3
58:19
**relates** 19:1
**relationship** 22:5
**relevant** 40:7,13
**remain** 39:4
**remember** 7:18 8:1
9:5,17 47:5 55:2
**reminders** 73:18
**remote** 40:8
**remotely** 4:10
**removed** 47:16
48:4
**repeat** 71:5
**rephrase** 57:1
**replied** 70:21
**reply** 39:8
**REPORTED** 1:24
**reporter** 4:5,8,15
5:11,14,25 11:14
11:22 77:7
**represent** 63:4
**request** 6:5 44:22
44:25 59:13,18
71:11,12
**requested** 58:15
68:16 75:25
**requests** 45:6
**requires** 68:2
**residence** 7:3
**resolve** 46:24
**resolved** 8:10 46:24
**resolving** 47:6
**respect** 23:17
**respond** 11:21
51:12
**responded** 44:7
52:12
**responding** 38:10
**responds** 39:9
**response** 42:18
52:21 54:4,9
70:22

**responsibility** 54:5
60:19
**responsive** 70:18
**rest** 26:1
**restorations** 62:21
**RESTRAINING**
3:10
**retire** 10:25
**retired** 10:17,18,21
**review** 6:13 22:17
43:16 47:2 62:16
71:17 75:1
**reviewed** 22:4
23:12,19
**Reviews** 30:7,15
42:12 43:20 44:8
45:17 53:18,22
62:17 63:22 64:3
72:1,4
**revise** 35:18
**right** 5:1 7:10 8:7,9
18:5 19:6 20:20
21:15,24 27:10
29:21 32:3,23,23
32:25 33:2,23
34:18,18 35:6,10
37:3 41:11 45:8
45:25 46:3,7,21
48:6,10 50:10
51:12 52:20 53:4
53:7,14,24 55:20
56:13 59:15 62:1
63:18 64:5,9
67:24 69:20,25
70:5 71:16 75:16
**rightly** 37:10
**Rocke** 2:4 3:13
**role** 10:14 14:14,14
**roles** 14:7
**rolling** 73:11
**room** 7:5
**roughly** 12:23
**routed** 30:16 48:17
48:20 52:8
**RPR** 1:24 77:24
**Rule** 76:1

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 86

**rules** 5:5
**run** 63:5

---

**S**

**S** 2:1
**S-u-z-a-n-n-e** 4:24
**sake** 6:25
**satisfaction** 22:18
  43:17
**save** 22:20,22 29:13
**saying** 31:18 35:19
  39:8 44:11 52:16
  56:7 61:1,2
**says** 39:10 46:23
  51:15 52:22 53:7
  53:14,14 56:13
  58:7 63:16
**scheduled** 65:9
**school** 8:25 9:9
**screen** 35:25 47:12
**screenshot** 41:20
  63:5
**scripted** 66:6
**scroll** 69:15
**seal** 77:13
**search** 16:11,17,18
  16:19 25:19 28:3
  32:4 41:8 74:5,8
  74:11
**Seattle** 2:5
**second** 17:25 34:23
  36:3 48:13
**section** 63:25 64:6
**see** 16:11 18:25
  21:7 22:19,20
  23:22 30:19,23
  33:18,23 34:24,24
  35:3 36:2 38:21
  45:10,12,21 47:11
  52:16,21 53:19
  54:21 55:4 56:3
  57:14 60:14 62:2
  63:8,19 64:5,7,16
  65:3 66:16 67:3
  69:8 70:16,18,22
  71:19 72:12 74:23

**seeing** 42:7 43:4
  51:5,8
**seeking** 16:16 61:7
**seen** 23:3 29:21
  30:22 42:10 64:15
  64:16
**self-evident** 10:5
**self-taught** 14:2
**send** 26:21 31:1
  37:18 38:23 39:6
  44:11 47:11 50:8
  50:20 54:10,24
  55:5 60:9
**sending** 26:24
  57:16,24
**sense** 8:20
**sent** 3:12,14 24:19
  26:17 39:15,16,18
  40:14 44:6 47:13
  50:2,21,21 64:24
  70:16
**sentence** 35:11
**SEO** 24:21 25:16
  25:18
**September-ish**
  27:18
**sequence** 29:7,9
**serve** 28:13
**service** 24:2,3
  54:11 61:5 67:17
**services** 11:4,6,9
  13:25 15:22 16:5
  16:5,20,25 17:8
  23:23,24,25 28:11
  28:16 54:7
**set** 5:6 26:18 33:19
  34:11 36:19 42:2
  77:12
**setting** 14:9
**setup** 48:21
**seven** 54:2,19
**share** 35:25
**shared** 17:22 26:18
  26:18 38:4 50:2
**sharing** 6:10
**shop** 28:20

**Shorthand** 77:6
**shortly** 59:15 62:3
**shown** 42:15
**shrugs** 11:21
**sic** 10:23 71:23,25
**signed** 33:21
**signing** 75:25
**similar** 41:22
**Simpson** 2:3 3:4
  4:11,20 11:16
  21:19,23 22:16
  29:2 43:15 46:9
  46:13 60:22 62:4
  62:8,11,13 75:19
  75:23
**site** 15:15,16 16:14
  18:10 31:14,21,22
  31:24 32:10 34:6
  36:3 60:14,21
  74:9
**sitting** 35:21 49:5
**situation** 58:21
  59:5
**situations** 61:17
**six** 41:7
**size** 63:19
**skill** 77:11
**social** 28:17
**software** 14:8 28:9
**sold** 11:1,12
**sole** 14:20
**solely** 20:4 24:2,3
**somebody** 18:3
**son** 44:2 46:19
  48:23 49:2,6
  62:20
**soon** 46:25
**sorry** 11:14 21:14
  29:9 30:17 35:11
  36:4 47:3,21
  54:13,14 56:21
  57:12 63:11
**sort** 27:2 49:11
  58:18 59:22 66:23
**sound** 19:22
**sounded** 59:4

**sounds** 6:24 12:14
  23:19
**space** 18:17
**spam** 61:17
**speak** 31:15
**speaking** 5:13
**special** 12:19
**specializes** 62:21
**specialty** 12:19
**specific** 44:15
  55:11 56:19 67:12
  68:11 71:11
**specifically** 10:14
  15:21 30:20 48:15
  48:20,24 52:6
  55:22 64:23 65:7
  66:25
**specify** 66:25 67:9
  68:13
**spell** 4:22
**spent** 12:23
**spiel** 11:18
**SPRAVATO** 16:4
**staff** 35:6 37:21
  38:21
**stamp** 71:20
**stand** 24:22 51:24
**standard** 59:6 75:3
  75:5,10
**standout** 21:2,5,6,8
  24:22 25:2 74:24
  74:25 75:5
**start** 5:17 29:10,11
  43:22 62:14 72:17
**started** 72:6
**state** 4:7,22 14:18
  77:3,7
**STATES** 1:1
**static** 39:4
**stays** 39:11
**steering** 68:3
**Step** 19:7
**steps** 65:1
**stimulation** 12:2,20
**stipulated** 4:11
**stipulation** 4:6,16

**stop** 27:16
**stopped** 62:24
**strategist** 13:11,12
  13:17
**Street** 2:4
**stroke** 12:7
**studies** 9:3,10
  12:12
**stuff** 28:14
**subjective** 52:14
**submission** 63:6
**submitted** 50:23
**subscribed** 20:7,24
  25:13,14,16,21,24
  38:9,16,25 49:21
  56:10 70:23
**subscriber** 20:9
  69:22 73:12
**subscribers** 32:1
  34:6 60:23
**subscription** 17:23
  18:21 24:22 34:15
  34:16 37:15 59:16
  59:19 73:23 74:15
  74:20
**subscriptions** 24:24
  75:4
**subsequent** 42:14
**sufficiently** 52:12
**suggesting** 47:15
**suicide** 7:23
**Suite** 2:5
**summary** 27:21
**support** 3:10,11
  71:23,25
**sure** 5:12,18,24 6:9
  8:6,8 11:20,24
  19:11 21:13,18
  26:2,4 27:22
  29:15 30:1,2 36:1
  36:9 38:2,9,13,19
  40:22 42:14 53:21
  53:25 56:23 60:20
  61:6 71:4 72:5,8
  72:19 73:3,4 75:9
**Suzanne** 1:15 3:1

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 87

4:13,24 77:9
**swear** 4:9
**switch** 8:19
**sworn** 4:14 77:10
**system** 73:20
**systems** 24:11

---

**T**

**T** 4:19 77:1,1
**TACOMA** 1:2
**take** 5:24 6:1,1,7
  8:23 21:16,17
  29:15,24 30:3,18
  34:8 38:23 40:1
  46:5 47:19 63:1
**taken** 1:19,23 5:2
  21:21 46:11 62:6
  65:1
**takes** 28:8 32:3
**talk** 10:21 21:25
  29:6,7 30:4
**talked** 23:22
**talking** 5:15 27:7
  33:15 36:9 47:1,5
  47:24 54:23,23
  64:5
**team** 31:11,12 32:5
  32:6,23 33:5,6
  38:12 41:10
**technically** 10:17
  50:7
**Technologies** 27:6
**tell** 13:22 22:2
  33:10,25 74:19
**telling** 31:18 54:8
**TEMPORARY**
  3:10
**term** 16:18 51:22
**terms** 11:5 49:18
**test** 63:5
**testified** 4:16
**testify** 8:14 22:3
  23:16
**testifying** 7:1 32:20
**testimony** 5:14
  27:10

**text** 72:8
**thank** 4:11 40:1
  42:11 43:9 46:8
  61:23 63:17 69:3
  75:16,22,23
**therapist** 7:22 8:23
  61:10
**therapy** 3:9,11 12:1
  12:10 25:22 40:20
  40:24 41:3 57:3
  71:23 72:18,24
**thing** 19:7 28:19
  52:4 67:5
**things** 11:17 28:2
  30:25 48:14 52:6
**think** 7:15 18:11
  40:1,18,23 41:5
  51:7 52:25 56:16
  56:17 57:2,6,8
  58:19 59:15,21,21
  60:2 69:23
**third** 18:1 23:7,7
**thoroughness**
  75:18
**thoughts** 59:17
**thousands** 28:7,7
**three** 16:4 17:4,9
  17:10,13 18:1
  19:18 20:3,3 29:3
  40:10 45:20 49:14
  57:18 66:21 69:15
**tiers** 24:23,25
**time** 5:15 6:4 7:22
  8:22 13:17 19:5
  29:15 30:18 35:19
  38:16 39:25 45:2
  45:8 47:19 65:23
  71:20 75:16,18
**timeframe** 34:1
**timeline** 72:6
**timely** 38:3
**times** 7:13 10:6
**tiny** 63:21
**title** 13:9 47:9
  53:16 55:12
**titles** 48:7

**TMS** 1:5,9 3:9,11
  10:22,23,25 12:1
  12:2 13:5 16:2,8
  16:17,20,25 22:7
  24:9 25:22 26:8
  31:19 33:12 36:23
  37:8,12 38:15
  39:10,14,25 40:20
  40:24 41:3 42:18
  42:20 43:3 44:6
  48:16 52:7 53:16
  55:9,12 57:3
  64:25 66:18,19
  67:15,16 69:21
  72:13,17,24 73:22
**TMSTherapyNe...**
  3:12 14:15,18
  22:3 23:23 32:13
  39:13 43:5
**TMSTherapyNe...**
  23:16
**TMSTherapyNe...**
  10:13,15,20
**today** 5:7 6:11 7:1
  22:1,3 23:13,20
  23:25 34:3 35:21
  39:24 49:5 75:17
**today's** 61:16
**top** 5:24 8:24 27:23
  52:20
**topic** 23:22 27:5
**topics** 23:10,12,17
  23:20
**track** 9:4
**traffic** 17:16
**tran-** 56:13
**transaction** 56:13
**transactions** 22:10
**transcranial** 12:2
  12:20
**transcript** 5:11
  77:9
**transition** 12:18
**transitioned** 13:3
**treated** 44:15
**treatment** 12:3,3

12:10,16 13:2,6,8
  16:16 19:4 37:25
  54:22 56:4 57:15
  57:19 58:3 67:16
**tremendously**
  74:10
**trial** 8:14,18
**tried** 22:11 54:1,8
  54:15,20
**trigger** 73:17
**true** 33:8 49:20
  67:15,15 70:1
  77:10
**try** 5:16 18:17 26:3
  54:5 65:8 67:3
  71:11
**trying** 47:17
**turn** 27:4 41:13
  49:13
**turned** 13:18
**Turning** 14:14
**two** 5:16 15:7,7,8
  18:2 19:20 30:25
  31:3 36:6,22 40:3
  59:5 66:20 68:18
  68:20 69:15 70:25
  71:7
**type** 7:18,21
**typical** 30:12 61:21
**typically** 65:22
  66:5 67:8,16
  73:19

---

**U**

**U.S** 40:20 41:3
**uh-huh** 36:8,11
  41:1,1 42:21
  43:21 47:10 61:24
  63:13 64:11 69:12
  69:17 75:14
**UMS** 71:23
**unable** 65:4,10,12
  67:20 71:12
**unaware** 13:7
**understand** 35:23
  55:8 59:1,23

**understanding**
  11:3 12:1 17:12
  32:11,12
**understood** 5:20
  27:10,22 40:22
  52:13,25 53:2
  59:22
**undiscounted**
  74:19
**unethical** 60:8
**unfortunate** 7:25
**unfortunately**
  61:16
**Union** 2:4
**UNITED** 1:1
**University** 9:22
**unpaid** 55:14 59:20
  60:3 73:13,15
**unusual** 68:12
**unverified** 18:4,8
  18:12 19:10,12,16
  33:1 39:1,7 40:15
  40:25 41:9,25
  51:3 55:15 59:19
  63:10
**update** 39:10 41:6
  41:11
**updated** 39:3,6
  65:15 66:14
**urgent** 61:19
**use** 15:23 26:20
  51:23 56:16 57:2
  74:11
**user** 18:7 19:12
  30:9 40:1 42:22
  57:6 58:3
**user's** 36:16
**users** 25:13,16
  38:25 39:1 57:14
  57:15
**usslothman** 71:25
**usual** 40:3,5
**usually** 27:3 65:24
**uwslothman** 71:24

---

**V**

David Penner MD, PLLC v, et al. v. Clear TMS+, PLLC, et ano.

30(b)(6) Suzanne Jessee

Page 88

**value** 73:7
**various** 14:7
**vendor** 15:8,10,19
  27:7,9,16,24
**verbally** 11:21
**verbatim** 5:10,14
**verbiage** 60:15
**verification** 24:23
  51:18
**verified** 16:13
  17:17,22 19:19
  24:22 32:13,25
  33:7,24 34:1,3,20
  34:25 35:20 37:19
  39:25 40:25 42:22
  50:1,4,13,17
  51:10 52:17 55:3
  55:7,20 56:18
  57:7,12,15 60:10
**verify** 18:11 19:25
**versus** 56:18
**videoconference**
  1:12,17 2:2,8
**viewed** 41:25
**visibility** 33:6
**vs** 1:8

**W**

**W-9** 58:20
**wait** 5:16
**want** 14:15 17:10
  17:15 25:13,14
  27:5,22 28:24
  29:18 34:9 35:18
  35:18 38:1,8,19
  44:10,19 48:10
  49:23 50:5 52:22
  56:21 59:23 60:1
  62:19 67:9 70:22
  71:15 75:16
**wanted** 28:17 44:19
  58:19 64:22 65:6
  66:25 67:1
**wanting** 16:25
**wants** 44:14 49:22
  53:25

**Washington** 1:1,4
  1:9 2:5 4:7,15
  77:3,8
**wasn't** 36:9 37:2,5
  40:6 45:16 64:23
  72:5 75:8
**way** 16:15,16 17:25
  18:1 40:25 41:11
  42:3 59:17
**ways** 16:22
**we'll** 10:19,20
  28:23 29:6,7,10
  39:10 41:7 46:5,6
  62:3,14 75:20,21
**we're** 5:15 6:17,20
  8:19 11:19,23
  16:2 17:14 21:25
  24:10 28:22 29:11
  33:15 38:8 39:17
  46:3,4 51:22 61:5
  61:11,19
**we've** 9:25 23:22
  23:25 26:17 41:5
  70:9
**web** 26:5 27:1 39:2
  41:21
**website** 15:11,13
  16:18,23,24 18:4
  21:7 24:20 25:20
  27:2 28:1,3,5,6,8
  28:12 32:22 33:23
  40:17,24 42:2
  44:21 55:23 56:16
  57:3,14 58:19
  61:7,20 63:6
**websites** 14:9,10,12
**weeks** 24:12
**well-staffed** 38:14
**went** 31:25 34:7
  39:5 55:22 56:14
  57:20 71:8 75:7
**WESTERN** 1:1
**whatever's** 39:2
**whatsoever** 24:6
  49:24 55:4
**WHEREOF** 77:12

**white** 49:18
**Wilcox** 3:11 22:6,7
  44:9 45:19 47:14
  48:13,23 49:6
  52:21 58:14,17
**Wilcox's** 48:11
  59:13,18
**witness** 4:8,9,13 8:5
  11:15 75:22 77:12
**word** 32:2 38:22
  63:24 69:5
**wording** 74:12
**work** 13:12,18,22
  15:7,9,13,14,21
  16:6 31:14
**worked** 13:24 14:2
  14:11 73:24
**workflow** 73:21
**working** 8:22 13:9
  45:2 46:23 61:14
  62:24
**works** 35:23
**wouldn't** 30:22
  32:23 34:4 35:9
  35:10,13,13 55:5
  65:17 68:21 69:24
  73:7
**wrapping** 62:3
**writing** 8:14
**wrong** 37:2,6

**X**

**X** 4:19

**Y**

**y'all** 46:8
**yeah** 15:23 22:10
  22:23 24:3 26:11
  29:6,12,25 30:2
  30:11 32:8,17
  33:8,8,25 34:10
  34:19,22,25 35:17
  35:22 37:2 39:18
  43:8,11 44:9,14
  44:18,18 45:15,22
  47:24 48:3 51:8

  52:2,3 53:10,12
  53:19 55:8 63:21
  64:17 65:3,19
  70:4,17 72:19
  73:2,4 74:9
**year** 13:14,16 27:17
  27:19 40:19 41:2
**years** 8:3,3 12:23
**yep** 28:21 45:22
  69:9
**young** 13:24

**Z**

**zip** 20:16 54:19
**Zoom** 6:20

**0**

**1**

**1** 3:9,11 22:14,15
  23:8,22 28:23
  63:24
**1/22** 50:24
**1/31/2025** 3:12
**1:07** 48:13
**1:52** 69:13
**10** 1:23 4:1 21:17
  46:5 77:10
**10-minute** 34:8
**10/10/2025** 3:14
**10:28** 46:12
**10:43** 46:12
**11/22** 50:8
**11:12** 62:7
**11:20** 62:7
**11:41** 75:24
**11595** 1:25
**12** 8:3,3
**12:57** 45:19
**149** 75:6
**15** 75:11,12,15
**150** 74:1
**15th** 33:16 35:5
**16th** 45:25
**1917** 1:24 77:24

**2**

**2** 3:9,14 27:5 45:14
  45:15 64:10,13
**20** 12:23
**20-mile** 17:6
**20057** 20:16
**2009** 9:19
**2011** 9:7
**2018** 10:24
**2019** 40:18 41:10
**2022** 11:1
**2024** 27:18 66:11
**2025** 1:23 4:1 33:16
  35:5 42:2 45:19
  45:25 48:13 52:22
  53:6 77:10,13
**204** 45:11,13
**206.652.8670** 2:6
**22** 3:9
**23RD** 77:13
**29** 3:9,10,11
**2A** 3:9 28:25 29:5,6
  29:7 42:5
**2A-2C** 29:1
**2B** 3:10 28:25 29:6
  29:10,11,12,18,22
**2C** 3:11 28:25 29:6
  41:13,18
**2nd** 66:10 69:13

**3**

**3** 3:11 43:13,14,18
  46:16,16,22 47:7
  69:5
**3:25-cv-05033** 1:6
**30** 48:13 53:5
**30(B)(6)** 1:12
**30(e)** 76:1
**30th** 45:19 49:6
  50:21
**31st** 52:21 53:6

**4**

**4** 3:4,12,12,12
  45:14,15 46:23
  62:9,10,14 63:2
  63:24 64:10,13

```
    69:5
 43 3:11

          5
  5 3:13 62:5,11,12
    71:18
500 2:4

          6
 62 3:12,13

          7
7.4 54:20
 79 75:7

          8

          9
9:04 4:2
9:32 21:22
9:42 21:22
9:43 53:7
909 2:5
98101 2:5
```